DETERMINED IN

# THE SUPREME COURT

OF THE

## STATE OF CALIFORNIA.

[No. 20966. In Bank.—July 19, 1893.]

## THE PEOPLE, Respondent, *v.* WILLIAM HYNDMAN, Appellant.

CRIMINAL LAW—HOMICIDE—MURDER—INFORMATION—MEANS OF DEATH—DELIBERATED AND PREMEDITATED KILLING.—Murder, as defined in section 187 of the Penal Code, as being the unlawful killing of a human being with malice aforethought, includes both degrees, and an information which charges the offense of murder in the language of that section is sufficient, and need not state the means used to procure the death, nor allege that the killing was deliberate and premeditated.

ID.—JUSTIFIABLE HOMICIDE—FEAR OF BODILY HARM—PRECONCERTED ASSAULT—INSTRUCTIONS.— Where there is evidence tending to show that the defendant was assaulted by a woman, whereupon the deceased voluntarily joined in the assault, and threw defendant upon the floor, and by being upon him prevented him from protecting himself against being beaten with a hammer by the woman, the jury should be instructed that if the defendant had reason to fear and did fear that if his life was in imminent danger, or that he was in danger of receiving great bodily harm at the hands of the woman and the deceased jointly, and acted under the influence of such fears alone, and to save his own life or to prevent his receiving great bodily harm gave the mortal cuts to the deceased, he was justified, and the jury should acquit, and it is error to refuse such instruction and to instruct the jury that the deceased and the woman must also have had a preconceived design, and had agreed together to assault the defendant.

ID.—EVIDENCE—RECONCILIATION—PREVIOUS THREATS—INSTRUCTIONS.—Threats made by the defendant against the deceased previous to a reconciliation between them, may be shown in evidence, and it is proper to instruct the jury that their effect as evidence of malice depends upon whether the reconciliation on the part of the defendant was or was not in good faith.

XCIX. CAL.—1

ID.—APPLICABILITY OF THREATS—EFFECT OF RECONCILIATION—SELF-DEFENSE—
INSTRUCTIONS.—The court should exercise great care to prevent misconception
or misapplication of threats, or their being given undue weight by the jury,
and they should be instructed that threats are entitled to weight only when
clearly connected by circumstances with the time and manner of the homicide,
and that after reconciliation of a previous quarrel between the parties it will
not be presumed that they were moved by the old grudge, unless it appears
from all the circumstances, and that previous ill-will or malice cannot take
away the right of self-defense or convert a justifiable homicide into a murder.

APPEAL from a judgment of the Superior Court of Nevada
County, and from an order denying a new trial.

The facts are stated in the opinion.

*G. L. Waters,* for Appellant.

*Attorney-General W. H. H. Hart,* for Respondent.

HAYNES, C.—The defendant was convicted of murder in
the second degree, and appeals from the judgment and from an
order denying his motion for a new trial.

The body of the information is as follows: "William Hynd-
man is accused by the district attorney for the county of Nevada,
state of California, by this information, of the crime of murder
(a felony), committed as follows: The said William Hyndman
on, to wit, the eighth day of July, 1892, at and in the county
of Nevada, and state of California, and prior to the filing
of this information, wilfully, unlawfully, feloniously, and of
his malice aforethought, did kill and murder one William
Searle, contrary to the form, force, and effect of the statute in
such case made and provided, and against the peace and dignity
of the people of the state of California."

The defendant demurred to this information and the de-
murrer was overruled, and defendant also objected to the intro-
duction of any evidence upon the same grounds.  Briefly stated,
the points urged by appellant are:—

1. That the information does not allege the means used, nor
state facts sufficient to apprise the defendant of the nature of
the evidence the people will offer in that regard, or such facts
as would enable him to prepare his defense.

2. That the information does not allege that the killing was
"deliberate and premeditated."

At common law it was indispensable to a good indictment that the means used to procure death should be stated in all cases where such means were known, and if unknown, the absence of the allegation must be excused by the statement that the means used were unknown.   Under legislation adopted in England in 1851, and afterwards in Canada, an indictment in the form of this information is declared to be good, and this legislation has been incorporated into the statutes of several of the states.   Whilst there is no statutory provision in this state expressly declaring such form of indictment or information to be sufficient, it has several times been held that such averments are unnecessary.   (*People* v. *Alviso*, 55 Cal. 230; *People* v. *Hong Ah Duck*, 61 Cal. 388.)   In *People* v. *King*, 27 Cal. 510, and *People* v. *Cronin*, 34 Cal. 192, the question as to changes effected in criminal pleadings by the code was discussed.   In the latter case it was said :  " While it may be well to state the means by which death was caused, we do not consider such a course indispensable."   No case is reported in this state where such averments are discouraged, though held unnecessary.   To prevent misconception it may be added that in none of the cases so holding was the homicide committed in the perpetration or attempt to perpetrate arson or other felonies mentioned in that connection in section 189 of the Penal Code.   On the authority of the cases above cited the first objection made to the information cannot be sustained.

As to the second objection, the Penal Code, section 187, defines murder as follows:  " Murder is the unlawful killing of a human being with malice aforethought."   In *People* v. *Soto*, 63 Cal. 166, it was held that murder, thus defined, includes both degrees, and that it is sufficient to charge the offense committed in the language of the statute defining it.   (See also *People* v. *Martin*, 47 Cal. 101.)   Other points made by appellant require a statement of the circumstances under which the homicide occurred.

The defendant and deceased were working together in a mine a month or two prior to the homicide.   The superintendent met defendant in the mine, and the latter in an excited manner put his head down and said Searle (the deceased) had hit him with a drill or hammer.   Searle called defendant a liar, and

the two "squared off" to fight. The superintendent separated them and discharged them both, but soon after took Searle back and put him to work. Defendant was not re-employed. On the evening of the homicide Searle and the defendant met in the store of one Kohler, who also kept a bar in the same room. The old difficulty was talked over and they "made up friends," shook hands and drank together, and shortly afterward an-. other drink was taken and again they shook hands. Searle. made some purchases of provisions which were placed in a basket, and he left the store. He was then living with a woman named Lou Kane, who was not his wife, and who was reputed to be a woman of the town. Shortly after Searle left the store he returned with this woman and his basket and took a seat upon a bench. Lou Kane made some purchases, and while standing at the bar counter defendant asked her to treat, which she did. According to her testimony, defendant said to her he used to know her at Pioche, to which she replied that she never was there, and that defendant called her a liar, and she then "hauled off and slapped him in the face"; that the. defendant commenced slapping her, whereupon Searle came and shoved them apart. Other testimony tended to show that it was the woman who gave the "lie," and that defendant seized her by the arms after she had slapped him in the face. When Searle pushed the defendant and the woman apart the men grappled each other, and, after a short struggle, they fell to the floor, the defendant underneath. While in this position the woman struck the defendant at least twice with a hammer, cutting entirely through his ear so that it had to be stitched up to keep it together. Mr. Kohler testified that defendant called him twice, saying, "Oh, Kohler, Kohler," that he ran round and pulled Searle off, "but he was dead then, or as good as dead;" he never spoke another word." The fatal wound was inflicted with a pocket knife, one being in the thigh partly severing the femoral artery and another penetrating the heart. As to the stage of the struggle at which these wounds were inflicted, whether before or after the defendant was struck with the. hammer, the evidence is conflicting. The defendant testified positively that he did not take out or use the knife until he was struck with the hammer, and that he believed that it was

necessary to use it to preserve his own life, or to prevent great bodily harm. Lou Kane, on the other hand, testified that she did not strike defendant with the hammer until after Searle cried out that he was cut. There was also other evidence upon this point not necessary to be noticed in this connection.

Under this state of the case the defendant requested the court to instruct the jury that if the woman joined in the assault upon the defendant with a hammer or other instrument likely to produce death or to do great bodily harm, "and the defendant had reason to fear and did fear that his life was in imminent danger, or that he was in danger of receiving great bodily harm at the hands of said Kane and William Searle, the deceased, jointly, and that defendant acted under the influence of such fears alone and to save his own life, or to prevent his receiving great bodily harm gave the mortal cuts to the deceased, he was justified, and the jury should acquit."

This instruction was refused, and the court of its own motion gave the following: —

"If the jury find from the evidence that the deceased, William Searle, at the time of the homicide charged made an assault upon the person of the defendant and violently threw him to the floor and continued his assault in a violent manner, and the jury find further from the evidence that the deceased, Searle, and the witness, Mrs. Kane, had a preconceived design, and had agreed together prior to the inflicting of the wounds that caused the death of the deceased, to jointly assault the defendant and inflict upon him some great bodily injury, and you further find from the evidence that prior to the infliction of such wounds the said Mrs. Kane, in pursuance of such agreement, joined in the assault upon the defendant with a hammer or some other instrument or thing in her hands likely to produce death or to do the defendant some great bodily injury, and did strike the defendant on the head with such hammer, instrument, or thing, and the jury find from the evidence that such assault endangered the life of the defendant, or that he was in danger of great bodily harm at the hands of said Kane and deceased jointly, and you further find from the evidence that the defendant had reason for and did fear that his life was in imminent danger, or that he was in danger of receiving great bodily harm at the hands of said Kane

and Searle, the deceased, jointly, and that the defendant acted under the influence of such fears alone, and to save his own life or to prevent his receiving great bodily harm gave the mortal cuts to the deceased, he was justified, and the jury should acquit. If, however, you believe from the evidence that there was not any preconceived design or agreements between said deceased and said Mrs. Kane to inflict at the time of said homicide jointly upon the person of the defendant a serious bodily injury, and that the assault or injury, if any, were inflicted by the said Kane voluntarily, and without any design or request by the deceased, and if in such case, at the time of the infliction of such wounds, the defendant had no sufficient reason to apprehend a design on the part of the deceased to take his life or inflict upon him great bodily injury, then the defendant was not justifiable."

The court erred in refusing to give the instruction asked for and in giving the instruction above quoted. It certainly could make no difference to the defendant whether the deceased and Mrs. Kane had a preconceived design, and had agreed together to assault the defendant. If he had reason to fear and did fear that his life was in danger, or that he was about to receive great bodily injury, he was not obliged to ascertain whether there was in fact such preconceived design at the risk of converting what would be a justifiable homicide, if such preconceived design and agreement existed, into murder if it did not exist.

The deceased by being upon defendant effectually prevented the defendant from protecting himself against the woman. They were in fact co-operating in the assault and in the infliction of the injuries upon the defendant. The assault was first made by the woman. The deceased, whether there had been any prior agreement or not, voluntarily joined in the assault. It may be that he had no intention to inflict any great bodily injury upon the defendant, or to put defendant's life in danger, but he was not justified in assaulting him, or joining in the assault made by the woman; but in either case the deceased and the woman, whether there was a preconceived purpose or not, became mutually responsible each for the acts of the other, unless some dissent or remonstrance or disapproval was in some manner expressed either by word or act. Of course we do not intend to pass upon facts which are alone to be found by the jury.

There was, however, evidence tending to prove a state of facts which made the request preferred by defendant's counsel pertinent, and which we necessarily assume in determining whether the court erred in determining it and in giving the instruction above quoted.

The people, after giving evidence of the reconciliation between the defendant and the deceased, which took place in Kohler's saloon, and of the subsequent homicide, questioned certain witnesses as to threats made by the defendant towards deceased after the difficulty at the mine and prior to their meeting at the saloon. Evidence of these threats was received over defendant's objection. In view of this testimony the defendant requested the court to instruct the jury that if defendant and deceased in good faith "made up good friends, and that each forgave the other all past differences and animosities, and no new threats were made by defendant," that such former threats could not be considered by the jury as evidence of malice.

This instruction was given with the following qualification : "But if the jury believe from the evidence that the defendant had not in good faith forgiven the deceased and made up good friends prior to the infliction of the wounds by the defendant, then the jury has the right to consider the past threats of the defendant, if any there were, for the purpose, with the other evidence in the case, of determining the question of malice."

We think the evidence of previous threats was properly received, and cannot say that the modification of the instruction by the court was erroneous.

There is no class of evidence, however, more likely to be given undue weight and importance by juries, or requiring greater care on the part of the court to prevent misconception or misapplication. It does not necessarily follow, because a man avows an intention to commit a crime, that such intention really exists. Threats may be uttered in a transient fit of anger, or through bravado, and it requires careful attention to other circumstances to ascertain with reasonable certainty the actual intention of the party making them. One would naturally suppose that a sane man intending to commit a crime would not make known his purpose by threatening to perpetrate it, yet such threats have been fulfilled, and therefore, unless

under special circumstances, such evidence is competent. If, for example, the time or the manner in which the homicide is committed corresponds to the threat, or other circumstances clearly connect them, they are entitled to great weight; but "such is the indulgence shown human frailty that when two persons have fought even on malice, and afterwards to all appearance are reconciled, and fight again on fresh quarrel, it will not be presumed that they were moved by the old grudge, unless it appear from all the circumstances of the fact." (*State* v. *Barnwell*, 80 N. C. 470, citing Hawk. P. C., ch. 31, sec. 30; *State* v. *Johnson*, 2 Jones, 247; 64 Am. Dec. 582; *State* v. *Hill*, 4 Dev. & B. 491; 34 Am. Dec. 396.) Besides, if there had been no reconciliation, if the defendant was assaulted and placed under such circumstances that he had good reason to believe, and did believe, that it was necessary to take the life of the deceased to preserve his own or to prevent the infliction of great bodily injury, the fact of the previous ill-will or malice sustained toward the deceased could not take away his right to self-defense, or convert a justifiable homicide into murder.

The instruction as given does not, when considered with other instructions, exclude these considerations, and in many cases is all that could be necessary to say to the jury in that connection; but in viewing the peculiar circumstances of this case we think it advisable that the attention of the jury should be called in that connection to the qualifications above suggested.

The instruction given by the court upon the subject of good character is not objectionable.

The further contention of appellant that the evidence is not sufficient to justify the verdict need not be noticed, in view of the conclusion at which we have arrived.

The judgment and order appealed from should be reversed and a new trial granted.

BELCHER, C., and SEARLS, C., concurred.

For the reasons given in the foregoing opinion, the judgment and order are reversed and a new trial ordered.

McFARLAND, J., HARRISON, J., GAROUTTE, J., FITZGERALD, J., PATERSON, J.