## STATE OF IOWA V. MARGARET HOSSACK, Appellant.

**Murder:** EVIDENCE: *Photographs taken after death.* The admission of photographs, in a trial for murder, of deceased, who had been injured in bed, and died twelve hours thereafter, taken after death, was harmless error, in view of evidence showing the position of the body after the injuries were received.

FOUNDATION: *That hair has not been tampered with.* Hairs taken from an ax with which a murder is supposed to have been committed, and delivered to the county attorney, are not admissible, in the absence of evidence that they have not been tampered with.

EXCLUSION: *Striking out other testimony on account of.* Where hairs were taken from an ax supposed to have been used in a murder are excluded from evidence in a prosecution against the wife of deceased, as not being properly identified, it is error to refuse to strike out prior expert testimony that the hairs correspond with the hairs taken from the body of deceased, as such evidence tends to show that the crime was committed with an ax.

CREDIBILITY:   *How affected by marital relation to decedent.* **The**
   fact that defendant was the wife of deceased does not alter
   the rule that the credibility of her testimony, is for the jury
   and they may consider her interest, though the existence of
   the marital relation may strengthen the presumpion of inno-
   cence.

INSTRUCTION:   *Circumstantial evidence.* A requested instruction
   that, where a conviction is sought on circumstantial evidence,
   each particular fact necessary to connect defendant with the
   crime must be established beyond a reasonable doubt, is prop-
   erly refused, as failing to state that each fact is not required
   to be so established as an independent fact, but that the other
   facts may be considered in determining whether the fact in
   question is sufficiently proven.

MOTIVE AND MALICE.   An instruction in a prosecution of a wife
   for the murder of her husband that, if the murder is estab-
   lished, proof of previous ill feeling may be considered on the
   question of motive and degree of guilt, is not erroneous, as it
   only authorizes the consideration of such ill feeling as show-
   ing malice.

SAME.   But it was error to refuse an instruction that a good faith
   reconciliation tended to make past difficulties, immaterial and
   affected the question of motive, though it was charged that
   such a reconciliation would make past differences, alone, in-
   sufficient to show malice.

Review on Appeal:   MISCONDUCT OF PROSECUTOR:   *Objection below.*
   The question of misconduct of the prosecuting attorney in his
   argument will not be considered on objections first raised on
   appeal.

*Appeal from Warren District Court.*—HON. JAMES D.
GAMBLE, Judge.

WEDNESDAY, APRIL 9, 1902.

DEFENDANT was accused of the murder of her hus-
band, John Hossack. The indictment charged the crime in
the first degree. There was a jury trial, and from a verdict
of guilty, and the imposition of a sentence of life imprison-
ment thereon, defendant appeals.—*Reversed.*

*Henderson & Berry* for appellant.

*Chas. W. Mullan,* Attorney General, and *Chas. A. Van Vleck,* Assistant Attorney General, for the state.

WATERMAN, J.—The defendant and John Hossack were married in the year 1867 in the state of Indiana, and almost immediately came to this state, and resided up to the time of the tragedy on a farm in Warren county. Nine children were born to them, five of whom were at home when their father's death occurred. Hossack was killed in his bed on the night of December 2d of the year 1900. He received two blows, either of which was sufficient to cause his death. One blow was with a sharp instrument on the right side of his head, just above the eye. Its effect was to open a gash in his skull more than five inches in length, from which the brain substance oozed. The other blow was with a blunt instrument. It alighted just below the wound we have mentioned, and crushed in the skull. The last described injury was inflicted after the other. It is the theory of the state that an ax was used, and that, after the cut was given, it was reversed, and the second blow was struck with the head of the weapon. The family life of the Hossacks had not been pleasant, perhaps the husband was most to blame. He seems to have been somewhat narrow-minded, and quite stern in his determination to control all family matters. However this may have been, it is an unquestioned fact that for a long time dissensions existed between husband and wife, and the latter made complaints a number of times to neighbors. On one occasion, some years prior to the tragedy, she went to the house of one Haynes, and wanted him to come and quiet her husband, saying: "He will kill some of us before morning." Haynes replied: "I wouldn't touch Hossack. There is a law for a man that abuses his family." To this she responded: "I don't want you to touch him unless you finish him." To other persons she used such expressions, in speaking of her hus-

band, as these: "It would be God's blessing if he were gone." "Oh! why don't the good Lord remove him out of our way?" She complained at times that he had used physical violence to her, striking her with his hand and with a stove lid. Their troubles culminated on Thanksgiving Day, 1899. In consequence of the difficulty at that time, the wife left the home, and went to the home of a married daughter. There was some talk of a separation and division of property; but finally three neighbors were called in, and through their efforts all difficulties were apparently healed, and there was a general agreement between husband, wife, and children that they would live in peace and harmony in the future. That the wife did not place strong reliance upon the pledges made by her husband at this time is shown by the fact that she privately requested one of the neighbors to remain all night, expressing the fear that her husband would make trouble again as soon as they were gone. It is true, however, that with a single exception, next to be noticed, no more of their family difficulties were made public, and the children all testify that dissensions ceased after this time. A witness says that some two months after this reconciliation, when questioned as to her home affairs, the wife wept and said, "It is just as bad as it ever was." On Thanksgiving Day just preceding the tragedy, there was a family reunion at Hossack's house. The feast customary to the occasion was partaken of, and good feeling seemed to prevail on the part of all. On the following Saturday, Hossack and his youngest son, Ivan, had been to the coal bank. They returned about 4 o'clock in the afternoon. So far as known, there was no difficulty between the parents on this day. Shortly after dark the different members retired for the night. We attach the plan of the house which appears in the record,

as it will conduce to a clearer understanding of subsequent events.

PLAT OF THE HOUSE.
EXHIBIT W.

EAST YARD GATE IS DIRECTLY EAST OF EAST PORCH.
GRANARY IS SOUTH AND A LITTLE WEST OF SOUTH
KITCHEN DOOR.

The son Will, with his sisters Cassie and May, slept upstairs in rooms reached by the staircase shown in the kitchen. James and Ivan occupied the room adjoining that of their parents. The only direct evidence of the events of this bloody night preceding the injuries which were inflicted on Hossack comes from defendant. Without detailing all previous matters, it is enough to say that she and her husband went to bed together; she lying in front, or on the east side of the bed, which stood with its head towards the south. Her husband, manifestly, was lying on his left side, or at least with the right side of his head uppermost. The wife lay upon her right side, facing

the door.   Her story is that she was roused from her sleep
after midnight by a noise such as would be made by strik-
ing two boards together.   She jumped out of bed, went
into the sitting room, saw a light shining on the north wall,
and then heard the door closed which opened on the porch.
She went to it, and found it was not pulled entirely shut.
Then, hearing groans or strange sounds from her husband,
she called the children down from upstairs, telling them
that some one had been in the house, and she thought their
father was hurt.   When the children came down, which
was at once, a light was struck.   Their mother was clothed
only in a chemise and drawers.   Together they all pro-
ceeded to the father's room, and found him in the condition
we have described.

It now becomes necessary to go back to the preceding
afternoon, and gather up some scattered circumstances
which have a bearing on the issue of fact; for it is one of
the strong contentions of appellant's counsel that the testi-
mony does not support the verdict.   After Ivan's return
from the coal bank, he found the ax at the wood pile; and,
as it looked like a storm, he carried it to the granary, and
placed it therein.   On the morning after the tragedy it
was found under the granary.   Some dried blood was found
on the handle of the ax, but it does not appear to have
been human blood, and it is shown satisfactorily that the
Thanksgiving turkey was killed with it but three days prev-
ious.   Three hairs were also taken from the ax, but this was
not until it had been handled considerably; having been taken
from under the granary, and laid for a moment on the hog
pen, and then replaced under the granary, where numerous
hairs of some kind were upon the ground.   There is some
evidence that the family dog was very stupid, acting as
though he were drugged, shortly after the murder.   No
blood was found on the clothing of defendant, except a few
drops on the back of the right sleeve of her chemise, and
just below the right shoulder, and a smear lower down.

We may dismiss the matter of the blood on the ax, about which much is said by counsel, from our consideration. We take up now the other facts. There is some evidence of a motive on defendant's part to commit this crime, and no evidence of any motive on the part of another human being. It is true, counsel for appellant have much to say about the reconciliation of a year previous, and treat it as wiping all bitterness out of the heart of this woman, and replacing it with love and affection. No doubt, the interference of neighbors induced these people thereafter to be more careful in making their troubles known, but the jury may have thought it hardly possible the ill feeling of years was so easily removed. Besides, we have the testimony of one witness to defendant's statement that dissensions existed after that time. We need not analyze defendant's story. It is enough to say the jury may well have believed her guilty, if the story was untrue, and the evidence before them was sufficient to justify disbelief in it. But some testimony was improperly admitted, tending to show the family ax was the weapon used in committing the crime; and, as will be readily seen, that was an important circumstance in aid of the state's case. What conclusion would have been reached on the facts had not this evidence been received, we have no means of knowing. The evidence will be given later, with our reasons for believing it inadmissible under the conditions existing at the time it was offered. It is sufficient now to say the case against the defendant was wholly circumstantial, and she could not but be prejudiced when proof of any material circumstance was strengthened or aided by other than competent legal evidence.

I.   Three photographs of Hossack's body, as it lay in the bed after death, were introduced by the state. Of these, Exhibit C shows the wounds on the head. This picture was taken after the body had been moved and raised so that the wounds were plainly visible. This exhibit is not spec-

ially objected to in argument by defendant's counsel. Their main contention is as to the other two pictures, Exhibits D and E. They are in some respects indistinct. About all that is disclosed by them is the position of the body on the bed after death, and before it had been disturbed. One claim made is that the view is not an accurate presentation of the situation; that it shows the body to be nearer the front of the bed than it in fact was. The evidence all shows these pictures to have been taken some 24 hours after the wounds were given, and about half that length of time after death. It also shows that, during the hours that Hossack lingered alive, he possessed some slight power of motion in his right arm and leg. Except in the argument for the prosecution, there is no claim that these pictures represented the position in which Hossack lay when he was struck and no objection was made by defendant to anything said on this subject in argument. That it is now too late to found an objection on that argument, see *State v. Hutchinson,* 95 Iowa, 566; *State v. Shreves,* 81 Iowa, 615. The last two exhibits, we think, might with propriety have been ruled out by the court, but we cannot believe their admission constituted prejudicial error. The position of the body in bed was described by many witnesses,—even, in one instance, to the giving of the exact distance of his right foot from the front edge of the bed. But perhaps we had better say, in view of another trial, that while we are able to find, under the circumstances of the trial had, that defendant has no serious right to complain of the introduction of Exhibits D and E, yet as they had no special purpose to serve in the case, we do not approve of their admission, and we would suggest they be not used on a retrial.

II. In the morning, after the homicide, the sheriff took three hairs from the ax which was found under the granary, and put them in his pocketbook, and, some days after, they were placed in a bottle, which he delivered to the county attorney. Later Hossack's body was exhumed, and some hair taken from his head near

the wounds, by this witness. After this the witness, with
the county attorney, went to an expert. Witness delivered
to the expert the hairs he had taken from the head
of the corpse, and the county attorney delivered to such
expert a bottle containing three hairs,—supposedly the ones
taken from the ax; but there was no other evidence to identi-
fy them, or to show how they had been kept while in the
possession of the county attorney. The expert was called on
the stand as a witness for the state and gave evidence tend-
ing to identify at least one of the three hairs taken from
the ax as a human hair, and similar to those taken from
the head of Hossack. No objection was made at the time
to this testimony by defendant. Thereafter, when the state
offered the three hairs examined by the expert, and sup-
posedly taken from the ax, in evidence, on objection of de-
fendant they were ruled out, as not being properly identified,
nor anything shown as to the manner in which they were
kept by the county attorney; but a motion made by defend-
ant to strike out the evidence of the expert with relation
to the hairs was overruled. If the hairs were not admissible,
it is difficult to perceive why the evidence in relation to
them was retained. In criminal cases we are not so strict
in holding parties to a timely objection to testimony as in
civil causes. If this testimony was not admissible, it should
have been ruled out on motion. It is thought by the state
that, as the hairs were traced into the possession of the
county attorney, the presumption that he did his duty in the
matter will sustain the conclusion that the hairs were not
tampered with while in his possession. But it is no more
the duty of the county attorney than of any other person
to preserve and care for such articles. It was not his duty
to take them into his custody at all. He might well have
left them with the sheriff. In cases of this kind prelimi-
nary proof of the identity of the thing submitted to the

expert, and that it has not been tampered with, is required.

Rogers, Expert Testimony, 110; *State v. Cook,* 17 Kan. 394. The evidence of the expert should have been excluded. Its materiality is apparent. It tended to show that the ax was the weapon used. If that was the case, it was a strong circumstance against defendant; for it is unlikely a stranger would have found it in the granary, and exceedingly improbable that after the commission of the crime he would have delayed to cleanse it, or taken the pains to put it under the granary, where, by the way, it was often kept by the family.

III. Defendant asked an instruction in relation to the claimed reconciliation of defendant and her husband, and its effect on their previous difficulties, with reference to the question of motive. The court refused it, and gave instead the following paragraph:

"If you find from the evidence that on the day after Thanksgiving, 1899, a reconciliation and adjustment of all matters of differences and trouble was effected between the defendant and her husband, John Hossack; and you further find from the evidence that such reconciliation was in good faith entered into on behalf of the parties thereto, and was thereafter, including the night on which John Hossack was assaulted, if he was assaulted, in like good faith lived up to and observed by the parties, and that after such reconciliation and adjustment there was no further trouble or quarrels between them, including the night on which the said John Hossack is alleged to have been assaulted,—then whatever trouble, differences, or quarrels you may find from the evidence, if any, had existed or occured prior to such good faith reconciliation and adjustment, if any, would not, alone, be sufficient to show malice."

It is said in the way of criticism of this instruction that if there was in fact a good faith reconciliation, lived up to by the parties thereafter, then previous troubles could

not be considered as affording a motive. This seems true. It was not a reconciliation in good faith, lived up to in sincerity, if old animosities were still harbored. If in November, 1899, all previous differences had in fact been forgiven and forgotten, and this state of affairs continued down to Hossack's death, it is difficult to see why the law should resurrect troubles the parties had buried, and allow them any weight whatever. McClain, Criminal Law, section 419. *People v. Hyndman,* 99 Cal. 1 (33 Pac. Rep. 782); *Com. v. Holmes,* 127 Mass. 424 (34 Am. Rep. 391). The instruction asked should have been given.

IV. The following instruction asked by appellant was refused: "Where a conviction is sought upon circumstantial evidence, only, each essential and material circumstance or circumstantial fact which is necessary to make a complete chain of well authenticated circumstances must be established by the proof beyond a reasonable doubt. While it is not necessary that all of the circumstances which may be considered by you are to be established beyond a reasonable doubt, yet each particular fact or link in the chain of circumstances which are necessary and essential to connect the defendant with the commission of the crime must be established by the proof beyond a reasonable doubt. And if you shall fail to find all of the essential and necessary links or circumstances necessary to complete the chain beyond a reasonable doubt, you should then acquit the defendant. And also you are to find from all of the facts and circumstances the guilt of the defendant beyond a reasonable doubt, before you are warranted in returning a verdict of guilty." The court gave the usual instructions relating to circumstantial evidence, and we think they were sufficient. As asked, this instruction was susceptible of misapprehension. While each essential fact in a case of this kind must be proved beyond a reasonable doubt, it is not necessary that each of such essentials, standing alone, be so proven, nor that it be established

by independent evidence. The material circumstances, when given their respective places in the sequence of events, may strengthen and support each other to such an extent that on a consideration of the whole case the jury may be convinced beyond a reasonable doubt of defendant's guilt. This was the substance of the instructions given by the court, and it was all that need have been said. *State v. Cohen,* 108 Iowa, 208; *State v. Hayden,* 45 Iowa, 17; *State v. Novak,* 109 Iowa, 717.

V. Instructions 25 and 26 are excepted to by defendant. They relate to the state of feeling between defendant and her husband. In substance, the jury was told that previous ill feeling, if they found it to exist, might be considered as bearing on the question of motive, and also on the degree of guilt, if they found defendant committed the homicide. The expression in the last clause is especially criticised. Surely, if she committed the crime, her hatred of, or ill will, if any, towards, her husband, could be considered, as tending to show malice; and this is what we understand these instructions to mean.

VI. Defendant testified in the case, and the court told the jury: "Under our statute, a person charged with the commission of a crime is a competent witness, and may testify in his own behalf. The defendant in this case has availed herself of this privilege, and, in determining her guilt or innocence, you must consider her testimony. She testifies as an interested witness, and from an interested standpoint, and as such you should consider her testimony; and when you do this, together with all the other surrounding circumstances developed by the evidence, give the testimony of the defendant such weight, in connection with the other evidence in the case, as you may think it entitled to, and no more." This language seems to have been taken from an instruction approved by this court in *State v. Sterrett,* 71 Iowa, 386. We cannot agree that the existence of the marital relation alters the

rule as to the credibility of defendant as a witness, although it may have strengthened the presumption of her innocence.

Some other questions discussed are not likely to again arise.

For the errors pointed out, the judgment is reversed, and a new trial ordered.—REVERSED.