[Criminal No. 798. Filed May 4, 1934.]

[32 Pac. (2d) 337.]

GEORGE JOSEPH SHAUGHNESSY, Appellant, v. STATE, Respondent.

Mr. G. A. Little and Mr. James V. Robins, for Appellant.

Mr. Arthur T. La Prade, Attorney General, and Mr. John Francis Connor, Assistant Attorney General (Mr. Elbert R. Thurman, County Attorney, and Mr. Duane Bird, of Counsel), for the State.

ROSS, C. J.—George Joseph Shaughnessy was informed against in the superior court of Santa Cruz county for the murder of one Lon Blankenship. He demurred to the information on the ground that it failed to state a public offense. The demurrer being overruled, he entered a plea of guilty. The court thereafter took evidence for the purpose of determining the punishment to be inflicted. The sentence was that defendant suffer death by hanging.

Before pronouncing sentence and judgment, the defendant moved in arrest of judgment on the ground that the information stated no public offense.

The defendant assigns two errors: (1) The overruling of the demurrer and the motion in arrest of judgment; and (2) the infliction of the death penalty.

The charging part of the information reads:

"The said defendant, George Joseph Shaughnessy, on or about the 7th day of July, 1933, and before the filing of this information, at the County of Santa Cruz, State of Arizona, did then and there unlawfully, wilfully, knowingly, feloniously, deliberately, premeditatedly, and with malice aforethought, murder one Lon Blankenship, a human being."

The question is as to whether this description of the crime of murder is adequate under the statutes of this state. It falls far short of the prolixity and particularity of an indictment at common law, and perhaps would not stand the test of many of the jurisdictions of this country. Its shortness and simplicity are devoutly to be desired. The form provided in California is shorter still, for there it is sufficient to allege that John Doe murdered Richard Roe, giving place and time. *People* v. *Coen,* 205 Cal. 596, 271 Pac. 1074; *People* v. *Magsaysay,* 210 Cal. 301, 291 Pac. 582. In the Magsaysay case the court, speaking through Mr. Chief Justice WASTE, says, of an "information charging that appellant 'murdered' the decedent": "It states the offense in ordinary and concise language and is in the short form prescribed by the Legislature."

Before the legislature of California amended its law prescribing the short form of information and indictment, our law and its were practically the same. We copied our criminal procedure largely from California. *Marquez* v. *Territory,* 13 Ariz. 135, 108 Pac. 258. In that state it has been held many times that an information or indictment charging the defendant did "wilfully, unlawfully, etc., kill and murder" the decedent, giving time and place, is sufficient, and that it is not necessary to describe the wounds or the instruments used to inflict them. *People* v. *Delhantie,* 163 Cal. 461, 125 Pac. 1066; *People* v. *Suesser,* 142 Cal. 354, 75 Pac. 1093; *People* v. *Hyndman,* 99 Cal. 1, 33 Pac. 782.

Beginning with *Molina* v. *Territory,* 12 Ariz. 14, 95 Pac. 102, we have uniformly followed the California decisions. *Macias* v. *State,* 39 Ariz. 303, 6 Pac. (2d) 423; *Collins* v. *State,* 37 Ariz. 353, 294 Pac. 625; *Azbill* v. *State,* 19 Ariz. 499, 172 Pac. 658.

If the present information charged that the defendant did wilfully and unlawfully, etc., kill and murder Lon Blankenship, there could, under our decisions, be no question of its sufficiency. The contention is, however, that the omission of the word "kill," or its equivalent, from the information, is fatal; that it is not sufficient to allege that defendant did murder the decedent, such an allegation being only a conclusion of law. *People* v. *Aro,* 6 Cal. 207, 65 Am. Dec. 503.

Murder is defined as "the unlawful killing of a human being with malice aforethought." Section 4583, Rev. Code Ariz. 1928. To say that one murdered a human being is to say he unlawfully killed him with malice aforethought. The word "murder" embraces a killing of a human being as also the intent of the killer. The prescribed form of an indictment or information is given in section 4977 of the Code, and the charging part thereof is as follows:

"The said A. B. on the —— day of ——, 19—, at the county of —— (Here state the act or omission constituting the offense)."

The act constituting the offense as described in the information is that defendant did unlawfully, wilfully, knowingly, feloniously, deliberately, premeditatedly and with malice aforethought murder the decedent; that is, did with such intent kill the decedent. Words used in an indictment or information are to be accepted in their ordinary meaning, except where defined by the statute. Section 4981. This section requires that words used in an indictment or information that have a statutory definition shall be accepted with such definition, and, that being the rule, "murder's" definition embraces the unlawful killing of a human being with malice aforethought.

Section 5146 reads:

"After hearing the appeal, the court shall give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties, and no judgment in any criminal action shall be reversed for technical error in pleading or proceedings when upon the whole case it appears that substantial justice has been done."

In our Constitution, article 6, section 22, there is incorporated a similar provision. It reads:

"The pleadings and proceedings in criminal causes in the courts shall be as provided by law. No cause shall be reversed for technical error in pleading or proceedings when upon the whole case it shall appear that substantial justice has been done."

In the face of these legislative and constitutional provisions directed to the courts, we would hardly be justified in holding that the information does not sufficiently set forth the act charged in ordinary and concise language and in such manner as to enable a person of common understanding to know what was intended, and to enable the court to pronounce judgment upon a conviction, according to the right of the case. Section 4982.

We hold the information sufficient.

If we were disposed blindly to follow precedent, we would doubtless hold the information insufficient, send the case back for a new trial, so that a new information might be filed against defendant charging that he "killed and murdered" the decedent, instead of that he "murdered" him as alleged in the present information. This court has long since ceased to delay or defeat justice on so tenuous a technicality. If the times ever called for speedy justice for criminals it is now. Technicalities in pleadings or proceedings that do not prejudice their rights should be ignored and the law's penalty administered expeditiously and without fear or favor.

It is next said the court abused its discretion in inflicting the death penalty instead of life imprisonment. The court, with a view of exercising an enlightened and sound discretion as to the punishment, made an investigation of available facts concerning defendant before and at the time of the killing and subsequently. The defendant was eighteen years old at the time he killed Blankenship. He arrived in Nogales on July 3, 1933, having "hitch-hiked" from his home in Albany, New York, to visit a relative by marriage. He left Nogales July 7th, having first equipped himself with a .41-caliber revolver and holster and an army coat and hat which he surreptitiously took from the army building of which his relative was keeper or custodian. On the outskirts of Nogales he was overtaken by Blankenship, who, according to his story, stated to him he was going to Tucson, and invited defendant to ride with him in his automobile. When about nine miles out on the Tucson-Nogales road, defendant drew the revolver from his holster and pointed it at Blankenship, telling him to throw up his hands. Blankenship, while still driving, reached for the revolver, whereupon defendant shot him twice, inflicting wounds that resulted in death in a short time. He states he did not want or intend to kill Blankenship, but only to rob him, and that he shot through fear. He took Blankenship out of the automobile and carried him through a fence, where he left him, first picking his pockets. He then drove a short distance to a house beside the road where lived two Mexican women, told them a man had been shot, and asked to be allowed to telephone for a doctor. They had no telephone. He then returned to where he left Blankenship, and, with the assistance of one of the Mexican women and a passing motorist, lifted Blankenship into the latter's automobile. He then drove back to the

house of the Mexican women and tried to get them to take care of decedent, which they refused to do. He proceeded towards Tucson for three or four miles, when he left the main highway, taking a left-hand road which he followed only a short distance. Here he took Blankenship from the automobile, laid him on some rocks, where he was later found dead, and retraced his tracks to the highway. He had not proceeded far until he lost control of the car, left the road, and narrowly escaped a serious accident. The automobile was put out of commission near a service station, and the operator thereof secured a free ride for defendant with another motorist to Tucson. In Tucson he was arrested the following morning, and to the arresting officers he told the whole story. This presents a picture of the needless, heartless and cold-blooded murder of Blankenship in return for the ride he was so generously and bravely extending to defendant, a total stranger.

But it is argued that the court, in fixing the punishment, should have taken into consideration the defendant's tender years and the environment in which he was brought up and imposed life imprisonment. His history, as told by him and condensed by his counsel, is as follows:

" . . . His parents are very poor. They live in a little cottage outside of Albany, New York which his father built out of scrap lumber wherever he could find it. In school the appellant reached the seventh grade. He was put in a reform school when a child nine years of age and has since been kept in reform schools practically all of the time. In all of the reform schools he was constantly subjected to beatings and abuse and was compelled to associate with the worst types of juvenile offenders. The record shows beyond a doubt that the boy has never had a chance; that he is a product of social conditions rather than a willing criminal, and that his unquestionable delinquency was caused rather by

abuse and unwholesome surroundings and associates than by any trait of inherent or wilful maliciousness.''

This assignment admits that the punishment in first degree murder, when the defendant pleads guilty, is left to the sound discretion of the court and may be death or life imprisonment. This duty is statutory. Section 4585. It is hard to conceive of a duty more grave or unpleasant to discharge. It involves the taking of a human life, and, even though it is in obedience to the law of the land, the normal person dislikes to do it or see it done. For that reason the death penalty is seldom imposed except upon those who deserve it. Public clamor for the life of an accused and mob hysteria and excitement may sometimes inflame juries and influence them to go against their honest and best judgment, but not so with a judge on the bench whose training and education have taught him that the law is supreme.

The only possible excuse that might have been made in behalf of defendant was that he did not know the nature and quality of his act or that it was wrong. While he evidently is a ''moral imbecile,'' that is, totally unmoral, his testimony before the court does not give any evidence of insanity. This colloquy between him and the court shows that he understood:

''The Court: I desire to interrogate the defendant further to see if he knows exactly what he is doing. Stand up! I ask you again, do you realize what you are doing?

''The Defendant: Yes.

''Do you want to plead guilty to the crime of murder?

''Yes.

''Do you realize that the Court may sentence you to death if you do?

''Yes.

"You would rather that one man hear and pass upon your case than twelve?

"Yes.

"Do you realize that you are pleading guilty to murder in the first degree?

"Yes.

"What is first degree murder?

"Murder committed in the perpetration of robbery. . . .

"Do you understand, George, that the only thing left for the Court to do is to determine whether you should be sentenced to death or life imprisonment?

"Yes."

We cannot say the court abused its discretion in imposing the death penalty. The determination of the punishment when an accused pleads guilty of first degree murder is committed by the legislature of this state to the trial court, and to that court only, and, before we would be justified in disturbing that determination, it should clearly appear from the whole case that the court's judgment was capricious and arbitrary. *Winston* v. *United States,* 172 U. S. 303, 19 Sup. Ct. 212, 43 L. Ed. 456.

As before stated, the punishment fixed by the court was death by hanging. It is said that method of taking life was abolished after the commission of the crime by constitutional amendment and lethal gas substituted, that the former cannot be inflicted any longer and that lethal gas may not be used as to do so would violate the constitutional provision (Const., art. 2, section 25) against *ex post facto* laws. In *Manuel Hernandez* v. *State, ante,* p. 424, 32 Pac. (2d) 18, recently decided, we held that the taking of life by lethal gas was more humane and less painful than hanging, and that its use was not a violation of the fundamental law of the land.

We wish to add that counsel, both in brief and argument, have done everything possible in defend-

ant's behalf by presenting his case fully, clearly and ably.

The judgment is affirmed.

LOCKWOOD and McALISTER, JJ., concur.