341 P.2d 237

**STATE of Arizona, Appellee,**

v.

**Robert Dwight FENTON, Appellant.**

No. 1133.

Supreme Court of Arizona.

June 17, 1959.

Rehearing Denied July 7, 1959.

Robert O. Lesher and A. Alan Hanshaw, Tucson, for appellant.

Wade Church, Atty. Gen., Leslie C. Hardy, Chief Asst. Atty. Gen., and Franklin K. Gibson, Asst. Atty. Gen., for appellee.

JOHNSON, Justice.

Robert Dwight Fenton was informed against on the charge of murder, first degree. The information alleged that the defendant, on or about the 23d day of February, 1958, deliberately, premeditatedly and with malice aforethought, murdered Opal Keller Coward.

Two prominent members of the Pima County bar were appointed to represent the defendant, and a motion was made under Rule 250, Rules of Criminal Procedure, 17 A.R.S., for an examination to determine whether the defendant was insane or mentally defective to the extent that he was

unable to understand the proceedings against him or to assist in his defense. The court granted the motion and appointed two qualified experts to examine the defendant with regard to his then mental condition. Thereafter Dr. Charles Neumann, M. D. and Dr. J. K. Bennett, M. D., qualified psychiatrists, at a hearing, reported their findings after examining the defendant; the court found that the defendant was able to understand the proceedings against him and assist in his defense, and ordered that the matter proceed to trial.

The defendant was arraigned before the trial court on April 8, 1958, and entered a plea of not guilty. The defendant filed a notice, as required by Rule 192, Rules of Criminal Procedure, of his intention to introduce evidence at the time of trial that he was insane or mentally defective at the time of the alleged commission of the offense charged.

The defendant, before trial, withdrew his plea of not guilty, and entered a plea of guilty to the charge of murder in the first degree, and such plea of guilty was accepted by the court.

It is the duty of the trial court, under the provisions of A.R.S. § 13–453, in case of a plea of guilty to murder in the first degree, to determine whether the punishment shall be life imprisonment or death; Rule 187, Rules of Criminal Procedure, provides that where the court accepts the plea and has discretion as to the punishment for the offense, it may hear witnesses to determine what punishment shall be imposed; and Rule 336, Rules of Criminal Procedure, which provides for an inquiry into mitigating or aggravating circumstances of the offense, reads as follows:

"Inquiry into mitigating or aggravating circumstances.

"When the court has discretion as to the penalty to be inflicted on the defendant, it shall, upon suggestion of either party that there are circumstances which may properly be taken into consideration, hear evidence as to the circumstances summarily in open court, either immediately or at a special time and upon such notice to the adverse party as the court directs, or the court may inquire into such circumstances of its own motion."

The trial court thereafter received evidence, both oral and documentary, for the purpose of ascertaining what the punishment should be. A sentence of death was imposed and the defendant has appealed from the judgment entered.

We deem it advisable to set forth a summary of the matters presented to the trial court. There were no eyewitnesses to the murder, and the following facts are taken from statements made by the defendant to the officers, which were admitted in evidence at the pre-sentence hearing.

The defendant, a young man 24 years of age, arrived in Tucson, Arizona, on January 22, 1958, and shortly thereafter met the decedent and her husband, who were the owners of a drug store. He was unable to find employment and was invited by the decedent to move into their house and perform odd jobs on the properties owned by them. He lived with the decedent and her husband until the 14th day of February, 1958, when he secured a full-time job, and was asked to vacate the guest room because out-of-town guests were shortly to visit them. The decedent gave the defendant $20 at the time he left, and informed him that if he needed more or wanted to pay back what he had borrowed, that he could do odd jobs around the house on his day off from his regular job.

On the afternoon of Sunday, February 23, 1958, the defendant went to decedent's home to work in the yard, and when she was leaving for work he asked her for the sum of $200 but she refused to give him more than $40. The defendant related that he planned to steal everything of value in the house because decedent had refused to give him money, stating that he entered the house and filled suitcases with personal property and intended to hit decedent over the head when she returned and to then steal her car. He further stated that when decedent returned home about six in the evening he hid behind a door, and as she entered struck her on the head with the barrel of a .22-caliber pistol. In the words of the defendant:

"I struck her four times and the gun went off. I became panicky after I accidently fired the shot and in my panic I fired more shots into her until she quit moving. I went through her pocketbook and took her wallet and what loose change there was. I went out to the car and started to drive away but there was no key in the ignition. I tried to open the back door but it locked behind me. I went to the bathroom window, smashed the window to gain entrance again. I turned her pocketbook upside down on the bed and found the keys to the car and went back outside and drove away in the car."

He further stated:

"When I struck Mrs. Coward as she came into the room she turned and said to me 'Bobby, please don't hit me.' She tried to talk after the bullet, the first bullet, was accidentally fired. After the shot, which was accidental, I continued pulling the trigger, either in a state of panic or to put her out of her misery, suffered by the first bullet and the gun whipping. I liked Mrs. Coward very much. At times she seemed more like a mother or aunt to me rather than just a friend."

An autopsy of the body of decedent revealed she had been shot eight times and had sustained a laceration of the scalp on top of the head.

The defendant, after taking the car belonging to decedent and her husband, returned to his room and packed his clothes with the intention of going to California with a friend. However, apparently the friend had left and the defendant stopped at a drive-in theater, and as he stated, "I did this thinking that if I stayed out of sight until midnight the police might think I had escaped and had stopped looking for me." Defendant later started driving towards Nogales, Arizona, and when about 25 miles from that city noticed a highway patrol car following with the red light flashing. Defendant did not stop but instead fired three shots at the patrolman. The defendant finally stopped his car and got out, holding the pistol, and after threatening to shoot the officers and refusing to surrender or drop the gun, the defendant was shot in the leg by one of the officers and was captured.

The trial court, prior to the imposition of the sentence, had the benefit of a mental examination of the defendant by a qualified psychiatrist and a clinical psychologist. It was their finding that the defendant fitted into the category of psychopathic personality. These experts defined the condition of a person having a psychopathic personality as one usually of average intelligence, with a livable, pleasant and rather ingratiating personality. One of these experts testified: "They are people who are able to recognize right from wrong; who seem to know right from wrong, yet they seem to repeat anti-social acts and they seem not to profit or learn by experience, and they seem at times to be best classified not as immoral but amoral." These experts also reported to the court that as a result of their examination of the defendant it was their opinion that he was dangerous to society and that a person of his mental condition did not often profit by incarceration; that at the present time the only treatment is a "protective environment such as institutional care."

The only information presented to the trial court concerning the defendant's earlier years is disclosed in a written report of the mental examination made by the psychiatrist mentioned above, which was introduced in evidence without objection. It is therein disclosed that the defendant was a member of the Air Force for two years but saw no overseas service. He received a dishonorable discharge for AWOL because he "slugged a lieutenant and a non-com, escaped and went AWOL again." He served a sentence of ten months. Defendant then returned to his home in Ohio and went from one menial job to another, usually being discharged because of disagreements with his superiors. During this time he became involved with a 17-

year-old girl, and was sentenced by the juvenile court to nine months imprisonment. The defendant admitted his previous juvenile record, dating back to the age of ten years, indicating frequent hostile, aggressive anti-social behavior. After the sentence by the juvenile court it was discovered that the 17-year-old girl was pregnant, and the defendant was released after serving five months and later married the girl involved. This marriage was not a happy one, particularly after the birth of the child. During this period of time the defendant had various jobs, some of which he lost because of shortage in receipts. He was arrested for the theft of a car belonging to a friend and was sentenced to two months in jail and placed on probation for three years. Finally in October, 1957, he left his family and job, and in December of that year was arrested as a fugitive, released on bail, and after spending Christmas with his family left with a friend for Tucson, Arizona.

The trial court, in accepting defendant's plea of guilty to murder in the first degree, found that all the elements necessary to constitute that offense were present; defense counsel do not contend otherwise. The statutes of this state, A.R.S. § 13–452, define the degrees of murder in the following language:

"A murder which is perpetrated by means of poison or lying in wait, torture or by any other kind of wilful, deliberate and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary or mayhem, is murder of the first degree. All other kinds of murder are of the second degree."

It is clear beyond a shadow of doubt that the death of decedent resulted directly from violence wilfully and deliberately inflicted upon her by the defendant while engaged in the perpetration of robbery and burglary. It is difficult to imagine a more diabolical scheme than that outlined by the defendant in his statement to the officers. The defendant, having been befriended by decedent, given money, a job, a place to live and taken in the household as a member of the family, to then lie in wait and brutally beat her on the head with a pistol and fire eight shots into her body, can only depict a depraved, cruel, ruthless and brutal individual.

The trial court, after hearing all the testimony at the pre-sentence proceedings, and having carefully read the statements given by the defendant to the officers, the report of the psychiatrist, the transcript of testimony from the preliminary hearing on the criminal complaint, the F.B.I. report of the defendant, and the pre-sentence report filed by the adult probation officer, made the following comments before imposing the death sentence:

"I have gone over Dr. Neumann's statement and his study of this man and I have been influenced by his life history. I find that from what Dr. Neumann has found that he has spread misery wherever he has been. His life has been a sordid one, full of misery. He has injured the people who have been kind to him. He has stolen cars from his friends. I am going to file Dr. Neumann's report in the record.

"I have talked to Dr. Bennet who also examined this man, and his opinion is the same as Dr. Neumann's, that he is a psycopath or sociopath; that he is dangerous and that he is amoral and has no conscience whatsoever, and that at the present time they have no cure for him; that prison will not help the man and if he were to be released—and I confess, I have taken that into account as a possibility, and if it is wrong, I hope that it is reviewed by the Supreme Court, he would perhaps and probably, at least in the present state of medical science, be a danger to the community. He ingratiates himself to people and then injures them. If example will do any good at all, a man's life might be saved in the future and if it were saved, I know it would be a better life than this man's.

"If there were a cure for him, if I thought there was a cure, I wouldn't sentence him to death, but for the reason I have stated I am choosing the death penalty."

On appeal to this court the defendant contends that he should have been given a life sentence instead of the extreme penalty imposed by the trial court. The defendant makes two assignments of error: (1) the court erred in improperly considering the possibility of parole as affecting a sentence to life imprisonment; and (2) that the court abused its discretion in imposing the death sentence under the facts and circumstances, as shown by the record of this case.

We find no merit to the first assignment of error. This court has repeatedly held, beginning with Sullivan v. State, 47 Ariz. 224, 55 P.2d 312; State v. Macias, 60 Ariz. 93, 131 P.2d 810; State v. Jordan, 80 Ariz. 193, 294 P.2d 677; and more recently in State v. Coey, 82 Ariz. 133, 309 P.2d 260, that the county attorney, in his argument to the jury, may call their attention to the effect that if their verdict were life imprisonment rather than death, the defendant would be imprisoned for only a few years, and we said in the Coey case, supra, 309 P.2d at page 262:

"* * * where the jury has discretion to fix the penalty at either death or life imprisonment, it is proper for the jury to consider the probability that the defendant will actually serve the penalty should they determine the

sentence to be life imprisonment. * * * "

Certainly if a jury has the right, where they have the discretion to decide whether to impose life imprisonment or death in a first degree murder case, to consider the possibility of parole if their verdict were life imprisonment, then a court with a like discretion on a plea of guilty may properly take into consideration such possibility.

■ The trial court at a pre-sentence hearing is not bound by the strict rules of evidence applying in trials, State v. Levice, 59 Ariz. 472, 130 P.2d 53, and in determining the penalty to be imposed may properly consider the probability that the defendant who had been found to be a dangerous menace to society might be released or paroled if given a sentence of life imprisonment.

■ The defendant also contends the trial court improperly considered the possibility that defendant might some day be paroled if the court were to impose a life imprisonment, for the reason that under Rule 336 of the Rules of Criminal Procedure, permitting the court to inquire into mitigating or aggravating circumstances, the court was limited to aggravating or mitigating circumstances *of the offense charged*.

We cannot agree with this contention. In James v. State, 53 Ariz. 42, 84 P.2d 1081, we held that where a discretion is vested in the trial judge as to the limits of the sentence, it is not only permissible but almost essential, in order that he may properly carry out the obvious intent of the law to grade the punishment in accordance with the general character of both the offense and of the parties convicted, that he should have all the information possible as to their past conduct; in Chee v. State, 65 Ariz. 147, 176 P.2d 366, we upheld the trial court who considered the entire past criminal record of defendant at the time of passing sentence; and in State v. Smith, 66 Ariz. 376, 189 P.2d 205, we said that the trial court before sentence should inquire in defendant's moral character, antecedents and associations, to the end that the court may be informed as to the previous good character of defendant or his inclination to engage in criminal or antisocial conduct and activities.

■ We are of the opinion that Rule 336 should be given a broad interpretation, and that the "circumstances" mentioned therein do not limit the trial court to only a consideration of the mitigating or aggravating circumstances of the offense charged. State v. Owen, 73 Idaho 394, 253 P.2d 203.

The second assignment of error is based on the proposition that the lower court abused its discretion in imposing the death sentence, and that this court should reduce the sentence to life imprisonment.

120

■ It is true that under the provisions of A.R.S. § 13–1717 this court may reduce the sentence imposed, if the conviction is proper, but the punishment imposed is greater than under the circumstances of the case ought to be inflicted. However, we said in State v. Guerrero, 58 Ariz. 421, 120 P.2d 798, that the power given this court to revise and reduce sentences imposed by the trial courts should be used with great caution and exercised only when it clearly appears a sentence is too severe.

Counsel for the defendant strenuously contends the trial court abused its judicial discretion in imposing the death sentence when it remarked

"If there were a cure for him, if I thought there was a cure, I wouldn't sentence him to death, but for the reason I have stated I am choosing the death penalty."

In this connection it must be remembered that the mental condition of the defendant as to sanity or insanity both at the time he pleaded guilty and when later sentenced is not presented by this appeal. The trial court amply protected the rights of the defendant by appointing medical experts to examine him prior to trial under Rule 250, supra, holding a hearing and determining that the defendant was able to understand the proceedings against him and assist in his defense. One of the same medical experts testified at the pre-sentence hearing that while the defendant was diagnosed as a "psychopathic personality" he did know right from wrong at the time of the commission of the crime.

■ As we have heretofore stated the trial court, upon a plea of guilty to murder of the first degree, shall at its discretion impose a sentence of death or a sentence of life imprisonment. It could, therefore, be only for a manifest abuse of discretion that this court would be warranted in intervening on appeal to change the sentence in such a case from death to life imprisonment.

We are, of course, conscious of the importance of this appeal, and because of the gravity of the punishment inflicted have very carefully scrutinized the entire record of the proceedings before the sentencing court.

■ We do not believe that the remarks made by the trial judge at the time of sentencing, which are relied upon by the defendant as constituting an abuse of discretion, were such as to cause this court to reduce the sentence. People v. Walker, 33 Cal.2d 250, 201 P.2d 6. Regardless of such remarks the record also shows that at the time of imposing sentence the trial court,

in exercising its discretion, weighed and considered all the testimony of the expert witnesses, written statements of the defendant, the report of the probation officer as well as the defendant's past offenses, health, habits, mental and moral propensities, together with the fact that the defendant, in entering his plea of guilty, admitted all the elements constituting murder in the first degree. The record shows the commission of an atrocious crime and a total lack of any mitigating circumstances. We hold that the trial court did not abuse its discretion in giving the extreme penalty.

■ The public policy of this state is declared by legislature and not this court. That body has provided penalties of life imprisonment or death as punishment for murder in the first degree, and the duty of fixing that punishment is upon the trial court when the defendant pleads guilty. Shaughnessy v. State, 43 Ariz. 445, 32 P.2d 337. The individual views of the members of this court on the issue of capital punishment are irrelevant. We are limited to the judicial function of faithfully interpreting and applying the law as we find it. We find nothing in the record that would justify this court in interfering with the death sentence.

Judgment affirmed.

PHELPS, C. J., and STRUCKMEYER, UDALL and BERNSTEIN, JJ., concur.