## THE STATE v. MOORE, Appellant.

### Division Two, May 13, 1902.

1. **Assault:** EXTRANEOUS FACTS. A State's witness testified that just previous to the difficulty in which defendant shot W., he saw a man coming along the road from W.'s house towards the place where the difficulty occurred, but could not tell at that distance who it was, nor was there anything in the testimony to show that the man was defendant. *Held*, that this was a wholly irrelevant fact, and furnishes no ground for assuming that the jury inferred either that the man was defendant, or that he had gone to W.'s house for a malicious purpose, and, hence, such irrelevant matter furnishes no ground for reversal.

2. ————:CONDITION OF DEFENDANT'S CLOTHES. It is not error to refuse to permit a witness for defendant to testify as to the condition of defendant's shirt collar an hour or more after the assault occurred, after he had gone home unaccompanied, and then had ridden to town three miles away, without any proof that the shirt worn by him at the time of the assault was the same he wore at the time witness saw him.

Appeal from St. Charles Circuit Court.—*Hon. E. M. Hughes,*. Judge.

AFFIRMED.

*C. E. Peers* and *Silver & Brown* for appellant.

(1)   The testimony of Ben Walker (witness for the State) that he saw a man coming along the lane from the house of Woods, the prosecuting witness, to the public road, just previous to the difficulty, was improperly admitted over defendant's objections. There was nothing in the testimony tending to show that it was the defendant. It could have been offered for no other purpose than to show that defendant had.

State v. Moore.

been to Woods's house for some improper purpose and to show malice. It was irrelevant and calculated to prejudice the jury against defendant. (2) The testimony sought to be elicited from Woods, the prosecuting witness, on cross-examination, as to the frequency of his visits to defendant's house and the relations existing between him and defendant prior to the difficulty, was competent and should have been admitted, especially in view of the admission of the testimony of Ben Walker referred to supra. It would have tended to rebut any testimony going to show ill-feeling or malice on the part of defendant. (3) The court erred in refusing to permit witness Orr to testify as to the condition of defendant's clothing, as to its being torn and pulled apart, several hours after the difficulty. Also the testimony of the witness Anselm to the same point, an hour after the shooting. Wharton's Crim. Law (9 Ed.), sec. 767. It was a circumstance to go to the jury, and the remoteness as to time was a matter affecting only its weight. It would have been competent to show by the defendant himself that the condition of his clothing at the time mentioned by the witnesses was the same as at the time of the difficulty. Evidence of this character is admissible as to the clothing of the deceased in homicide cases. Wharton's Crim. Law (9 Ed.), sec. 767; People v. Ah. Duck, 61 Cal. 391; King v. State, 13 Tex. App. 277. There would seem to be no reason why it would not be competent in a case like this. (4) W. W. Walker, a witness for the State, after much questioning, finally answered that he was acquainted with defendant's general reputation for good morals, and said: "I didn't consider it good." This answer should have been stricken out on objection of defendant. It was but the opinion of the witness. A witness called to testify to the reputation of a party or witness can not give the result of his own personal experience or observation, or express his own opinion, but must confine himself to evidence of mere general repute.

Vol 168 mo—28.

Wharton's Crim. Ev. (9 Ed.), sec. 58; State v. King, 78 Mo. 555; Emory v. Phillips, 22 Mo. 499; 1 Greenleaf on Ev. (Redfield's Ed.), sec. 461. (5) The first and second instructions given by the court are conflicting and calculated to mislead the jury. The first tells the jury that the charge is assault to kill without malice, and defines malice to be the intentional doing of a wrongful act without just cause or excuse. The second declares that if defendant on purpose and intentionally made an assault on Woods and shot him with intent to kill him, and under such circumstances as not to justify him on the grounds of self-defense, they will find him guilty of an assault with intent to kill. From these instructions taken together the jury might have found malice an ingredient of the offense, and have gauged their verdict accordingly. Instructions which are inconsistent and calculated to mislead are erroneous. State v. Grugin, 147 Mo. 39; Stone v. Hunt, 94 Mo. 475; State v. Herrell, 97 Mo. 105; Stevenson v. Hancock, 72 Mo. 612.

*Edward C. Crow*, Attorney-General, and *Sam B. Jeffries*, Assistant Attorney-General, for the State.

(1) The testimony of Ben Walker, who was sworn on behalf of the State, to the effect that he saw a man going along the lane from the house of the prosecuting witness into the public road just prior to the difficulty, is assailed by appellant upon the ground that it was improperly admitted and because it served no purpose other than to prejudice the minds of the jury against the defendant. We are unable to detect error in this respect. To say the most, the evidence was immaterial and could have no effect whatever upon the mind of the jury. Certainly he was not prejudiced thereby, because heat of passion on the part of the defendant is admitted by the State. It is true there is nothing in the testimony tending to show that it was defendant, and such being the case, we are unable

to see injury to the defendant by its introduction. It matters not what may have been the purpose of the State in introducing it. ` (2) Defendant, in his cross-examination of the prosecuting witness, undertook to show that he had frequently visited defendant's house. Appellant insists that this was competent testimony and should have been admitted in view of the admission of the testimony of Walker, and that it would have had a tendency to rebut the testimony showing ill-feeling or malice on the part of the defendant. As stated by the court during the trial, the question of malice did not enter into the controversy, and, therefore, it was unnecessary in view of the admission on the part of the State that the act was committed in the heat of passion, to show ill-feeling or malice existing between them.

GANTT, J.—At the September term, 1899, of the circuit court of St. Charles county, the defendant was indicted for a felonious assault upon Zachary Woods. . The indictment contained three counts, the first for a felonious assault with malice aforethought; the second, a felonious assault with intent to kill said Woods; the third, for a felonious assault and wounding of said Woods whereby his life was endangered. Defendant was arraigned and entered his plea of not guilty.

At the March term, 1900, of said court, the defendant was put on his trial and convicted on the second count and his punishment assessed at imprisonment in the penitentiary for two years and six months. His motion for a new trial was sustained on the ground of the admission of illegal evidence and the cause continued.

The cause was finally heard on April 29, 1900, at the March adjourned term of said court, and the defendant was again convicted of a felonious assault with intent to kill said Woods, as charged in the second count of said indictment and his punishment assessed at two years in the penitentiary, and

he was sentenced accordingly. From that sentence this appeal is prosecuted.

The prosecuting witness Woods and defendant Moore were owners of adjoining farms some three miles from Wentzville in St. Charles county at the time of the alleged assault. A few days prior to the difficulty out of which this prosecution arose, Woods was notified to put in the posts for a hog fence between him and defendant.

On March 25, 1899, defendant was not on his premises when Woods went to set the stakes for the fence, and the latter designated the line by setting the stakes and told defendant's son to show his father the line when he returned. Woods and his nephew, Ben Walker, then rode out on the public road in the direction of Wentzville and soon met defendant, also horseback, coming from Wentzville and riding west in the direction of his home. When they met they checked their horses and accosted each other in a friendly way. Woods then said to defendant, that he had put some stakes up and had told defendant's son to show him how the fence would run, and asked him if he wanted the line to run with Foster's and defendant answered "Yes," and according to defendant's evidence, he said he didn't care for a few feet of land. The three then started on, Woods and Walker proceeding north, and defendant west, and just as they did so Woods called upon young Walker to witness that defendant said he was willing for his line to run with Foster's. Upon hearing this defendant turned his horse about and rode up between Woods and Walker. As to what occurred then there is a conflict between the witnesses. Woods says defendant rode up to him, and said, "You want to tear loose or cut loose from me, you d—n son of a bitch!" To which Woods instantly replied, "You are a d—n liar," and defendant came at him with his right hand in his coat pocket, and Woods reached over and grabbed defendant's right hand to prevent the drawing of his pistol, and the lunging of the horses dragged Woods off of his,

and he fell to the ground, and defendant's horse carried him some twenty or twenty-five yards, when he dismounted and left his horse and came hurrying back with his pistol in his hand, and just before he shot said to Woods, "You have been giving me dirt a long time," and began to fire at him, while Woods vainly endeavored to grasp his hand on the weapon to prevent his shooting him. Defendant fired four shots, three of which took effect upon Woods, one penetrating the neck; another, striking the lapel of his overcoat, failed to enter his body; the third, entering his left ear ranging upward and backward and came out of his skull. The fourth shot took effect in defendant's left arm. At the third wound Woods fell in the road insensible. This account of the difficulty was corroborated in all material points by young Walker, who, however, says he did not hear the first words passed between defendant and Woods when defendant turned and rode back to them, and only heard Woods, in reply to something defendant said, call defendant a d—n liar.

J. H. Dyer, who was in no way related to either party, rode up just as the war of words began. He testified that as he came in hearing distance he heard Moore, the defendant, say to Woods, "You are a g—d—n son of a bitch," and saw Woods grab him and defendant attempt to push Woods off with his left hand, when he called to them, "Men don't do that," and Woods hung on to Moore, and in the turn of the horses Woods fell on the ground and defendant's horse started west, when defendant jumped off of him, and came back with his pistol in his hands, and Woods attempted to keep him from shooting him. Woods had nothing in his hands. Defendant shot Woods three times.

*Per contra*, defendant testifying in his own behalf, gives the following account of the meeting between himself and Woods.

When they met they each greeted the other in a friendly way and stopped their horses and Woods, addressing defend-

ant, said: "Nelse, I was by where the boys had worked this morning and changed them stakes; that way that you set them would run the line down in the field." To which defendant responded, "Well, Zach, I don't care, I don't care for a few feet of land." Thereupon, he says, "Zach seems to be a little excited, and said, 'Are you willing for your line to run with Foster's?' and defendant answered, 'If Foster's line is right, of course I am.'" At this "Zach started to ride off, and he turned in his saddle, and with his left hand motioned to Ben Walker, and said, 'Ben, you hear that, don't you,' and I saw Zach was excited and it kind of flustrated me. I didn't know what was the matter with the man. I says, 'Zach, there's no use for you to fly off about anything. I have done right about the fence. If you had done as you agreed to do when we changed ends, there would not have been any trouble about the fence in any way. Now, Zach, you know when we changed ends of fences that I told you you might take rails enough out of my end to make a good fence between you and me, and I went away, and you took about half of my fence and moved it away and never fixed your fence as you agreed to.' And thereupon Zach says, 'You are a d—n liar.' 'Well now,' I says, 'Zach, I am no such thing, I can prove this by men on my place. Bill Anselm and Frank Reid told me how much you took, and I know you never put a rail between me and you as you agreed to.' And then he says a second time, 'You are a d—n liar.' And then I gave him the lie, and when I give him the lie, he slipped down from his mare and run kind of back up the road and grabbed me by the coat here with both hands and tried to pull me off of my horse, and I dropped the reins and struck him side of the head with my fist to knock him loose from me, and I think I hit him three licks, at any rate the last lick I hit him I struck him about the ear, and it swung him in front of my horse, and he wheeled short around and broke Zach's hold, and the horse stepped on the rein and that pulled him into the wire fence, and I got off on

the left side, and picked up the horse's foot and took it out of the bridle rein, and Zach come running up the road after me, and when he was quite close stooped and picked up that rock and says, 'I will knock your g—d—n brains out with this rock.' I was standing in the ditch that the road grader had made, about ten inches or a foot deep, and I stepped back and I stepped on the bench of the road next to the fence, and as I saw he was going to attack me with that rock I run my hand in my hip pocket that the gun was in, and I says, 'I will shoot you if you run up on me.' He says, 'Shoot, you son of a bitch,' and run and grabbed me by the collar with his left hand, and the first shot I just got the pistol out of my pocket and my elbow was caught under the wire of the fence and I shot him in the left side, I think, about the lapel of his overcoat, and he had a rock in his hand striking at my head with it, and I was warding it off, and I shot at him again before I got my arm from under the wire, and shot my own arm. After the second shot I got my arm out from under the wire, and shot him in the neck, and the next shot I shot him in the ear, and that knocked him down, and I quit. I had two more shots. He tore my shirt collar out, and grazed my face with the rock just enough to make it bleed and grazed my shoulder, that's the only lick he got in on me."

There was evidence from witnesses both for defendant and the State to the effect that he had some blood on his cheek when seen about an hour later on the road to Wentzville and at Wentzville, those for the State saying it was a scratch and did not have the appearance of an abrasion that would have likely been made with a stone. There was much evidence as to defendant's subsequent statements as to his shooting Woods, and that his only regret was he shot himself in the encounter.

The instructions are such as have often been approved by this court, and only two of them are challenged, and it is

insisted they are contradictory, and this brings us to the first assignment of error.

I.   The court instructed the jury that they would only consider the charge in the second count; the two other counts were withdrawn from their consideration.   Instructions one and two are as follows:

"1.   The defendant is charged in the second count of the indictment with the crime of assault with intent to kill *without malice,* and this is the only matter for your determination, the other two counts being withdrawn from your consideration. And you are further instructed that the indictment preferring this charge against defendant is no evidence whatever of his guilt; it is simply an accusation or charge, and no juror should suffer himself to be influenced in the slightest degree by the fact that this indictment has been returned against the defendant.

"Malice as above used means the intentional doing of a wrongful act without just cause or excuse."

"2.   The court instructs the jury that, if you find from the evidence in the case that the defendant at the county of St. Charles and State of Missouri, on or about March 25, 1899, on purpose and intentionally, made an assault on one Zachary Woods with a loaded pistol, and shot him, with the intent to kill him, the said Woods, and not under such circumstances as to justify him on the grounds of self-defense as explained in other instructions, then you will find the defendant guilty of an assault with intent to kill, as charged, and assess his punishment at imprisonment in the penitentiary for a term of not less than two years, nor more than five years, or in the county jail not less than six months, or by both a fine of not less than one hundred dollars and imprisonment in the county jail not less than three months, or at a fine of not less than one hundred dollars."

The court then gave a full and exceedingly favorable instruction on the right of self-defense.   The contention of de-

fendant is that the first and second instructions are conflicting in that "when taken together the jury might have found malice an ingredient of the offense and gauged their verdict accordingly." It may be remarked that we think it is apparent that the court intended to charge the jury that the second count charged an assault with intent to kill *without malice* aforethought, as had been charged in the first count, and eliminated that charge from the case. That the second instruction by itself is a correct declaration of law as applied to the facts in evidence is not to be doubted. Did the mere correct definition of malice in the first instruction contradict the second instruction in any way?

We are at a loss to grasp the strength of this objection. It is plain, we think, that the court by its first instruction advised and directed the jury that malice was not an element of the charge against defendant, and then told them what malice signified as used in the instruction, and that it was not necessary for them to find that the shooting was with malice and that defendant was not on trial for that offense; and then the court confined itself in the second instruction to the one charge left in the indictment, to-wit, an assault with intent to kill, and the jury responded to that charge only. No attempt was made to prove any other offense and there is no ground for holding the instructions to be contradictory.

II.   It is urged that reversible error was committed in receiving the testimony of Ben Walker, the nephew of Zachary Woods, to the effect that just previous to the difficulty in which defendant shot Woods, the witness saw a man coming along the lane from the house of Woods to the public road. As learned counsel say, there was nothing in the testimony to show that it was defendant, and the witness said he couldn't tell, at the distance he was from the man, who it was. It would seem that it was a wholly irrelevant fact, but it did not touch defendant, and there is no ground for presuming that the jury drew an inference first, that it was defendant, and sec-

ondly, that he had gone to the home of Woods for a malicious purpose.

Certainly the judgment will not be reversed on such a ground.

III.   The error alleged as to the refusal of the court to permit defendant to prove the frequency of the visits of Woods to defendant, is without basis either in law or fact.   The question was merely, "When before that had you been at his house?" referring to the testimony of Woods that a few days prior to the shooting he was passing through defendant's premises, and defendant had called him to look at his hogs, which he had done.   To the question Woods answered, "I don't know."

The court ruled that he could answer generally but it was not necessary to enter into details.   As counsel was not satisfied with this ruling, the court sustained an objection to any specific visits.

Certainly, if counsel desired to ask the general question of the witness as to his feeling towards defendant prior to the shooting, whether friendly or unfriendly, it would have been competent, but no such offer was made, but on the contrary the court had of its own motion indicated he would permit such a question, and it was declined.   But as the State expressly waived the question, it was no error to confine counsel to the offense charged in the second count.   Moreover, the fact that Woods might have made frequent friendly visits to defendant would have shown the good feeling of Woods, not of defendant, which latter seems to have been the purpose of the question.

There was no error in any view we take of the matter.

IV.   Complaint is also made that the court refused to permit witness Orr to testify as to the condition of defendant's clothing, as to whether it was torn or not on the day of and after the difficulty.

The difficulty occurred on the morning of the twenty-fifth day of March, between nine and ten o'clock.   This witness

stated he saw defendant that afternoon in Wentzville "sometime about three or four o'clock." He noticed a little small spot of blood on the left side of defendant's cheek. He was then asked the following question: "Now, do you remember whether the shirt he had on was torn at the collar or not?" Objection by Mr. Bruere, prosecuting attorney, sustained by the court. No exception saved, and, of course, the ruling is not before us for review.

But the same question was propounded to witness Anselm, as to the condition of defendant's shirt about an hour after the shooting, and it also was excluded, and exception was saved. The court excluded it on the ground that the testimony showed defendant had ridden off unaccompanied by any one, and to permit a defendant after an hour to prove a disarrangement of his own clothing as a circumstance in his favor would be self-serving statement, and excluded it. Defendant's counsel urge that as the condition of the clothing of deceased is admissible in homicide cases, no reason can be seen why it should not be competent for defendant in a case like this. That the clothing worn by the deceased at the time of homicide is evidence, when first identified as that worn when the homicide occurred, for the purpose of indicating the instrument by which and the part of the body on which the wound was inflicted or the direction of the flow of blood and the blood-stains thereon, is now well settled in this State, but in such cases a preliminary requisite is the identification of the garment as one worn by deceased at the time. In this case the witness was asked to state the condition of defendant's shirt collar when witness saw defendant in Wentzville, a point three miles or more distant from the place of homicide and at least an hour after the difficulty and after defendant had been to his home, without any proof that the shirt worn by defendant at the time was the same worn by him during the difficulty. It seems to us for this reason alone the evidence was properly rejected. It should at least have been identified as the same

shirt worn by defendant during the difficulty before proof of its condition, when witness afterwards saw it, could be admitted.

As the evidence was properly excluded, it is unnecessary to determine its admissibility in a proper case. It is obvious that its exclusion, in the very nature of the case, affords no reason for reversing the judgment in a case in which no other error was committed, even if it was error.

V.    Finally, it is assigned as a ground for reversal that the court refused to strike out the answer of witness Walker as to the general reputation of defendant, because after testifying that he knew the general reputation of witness for good morals, he was asked what it was, and he answered, "I don't consider it good." The point is made that he should have answered that it was good or bad.

The witness was not asked what he thought of defendant's character, but what his reputation was, and it must be held to have been that he didn't consider, from what the neighbors generally said, that it was good. No other reasonable conclusion can be drawn than that he meant that it was not good, and here again we must remark that after so many others had sworn defendant's reputation was bad, this answer, if construed as defendant interprets it, is no ground for reversal. The defendant had a fair trial. Two juries have pronounced him guilty, and the evidence abundantly justifies the verdict.

The judgment is affirmed.    All concur.