## THE STATE v. ED. F. ILGENFRITZ and LOTTIE DAVIS, Appellants.

Division Two, February 23, 1915.

1.  HOMICIDE: Clothing: Blood Stains.  To render blood-stained clothes admissible in evidence in a murder trial, there must be preliminary proof that the clothing was worn by the accused at the time of the homicide, and that there has been no change in its condition between that time and the time of the test for blood stains or the time the clothing is admitted in evidence. The proof need not be positive or direct, but may be circum-

State v. Ilgenfritz and Davis.

stantial, but should be such that the inference may be fairly drawn that the clothing was worn at the time of the homicide and that the blood stains were then received, and in this case the evidence does not authorize either inference.

2. ————: **Threats to Kill Defendant: Uncommunicated: As Explanatory of Inaction.** One of the defendants is being prosecuted for killing her husband, whose body was found just outside her door about daylight, where it had lain since about nine o'clock the previous evening, his pistol near-by, a ball having passed through his head. There was no evidence of self-defense. *Held*, that a threat made by deceased to the sheriff the preceding day to kill himself and his wife, not having been communicated to her, was not relevant or competent as explaining her failure to go outside of the house after the shots were fired and heard, to ascertain what had occurred.

3. ————: **Threats to Commit Suicide: Hearsay.** The sheriff should have been permitted to testify, in behalf of defendants, that, on the day of the homicide or the preceding day, deceased stated to him that he intended to kill himself and his wife. Suicidal threats are not hearsay, but verbal acts, and are as trustworthy as unsuccessful attempts at suicide. They are to be regarded as acts from which the state of mind or intention may be inferred in the same manner as from the appearance of the person or his behavior, or his actions generally. [Overruling the *obiter dictum* in State v. Fitzgerald, 130 Mo. 407, and the subsequent cases following it.]

4. ————: **Sufficient Evidence.** Evidence of intimate illicit relations between defendant and deceased's wife, that defendant had threatened to kill deceased, and that defendant ran from the scene of the homicide immediately after the shooting, was sufficient, when taken with other facts of this case, to authorize a submission of the question of defendant's guilt to the jury.

5. ————: **Motive.** Evidence of motive alone is not sufficient to make out a prima-facie case of guilt.

6. ————: ————: **Insufficient Evidence: Conspiracy.** Evidence of intimate illicit relations of deceased's wife with the other defendant, there being none of threats or of a conspiracy to commit the crime, and her presence in her own home outside the door of which the homicide occurred not being incriminating, and there being no testimony except the motive arising from the illicit relation connecting her with the crime, is not sufficient to sustain a verdict convicting her of the murder of her husband.

## Appeal from Adair Circuit Court.—*Hon. Nat M. Shelton*, Judge.

State v. Ilgenfritz and Davis.

REVERSED AND REMANDED.

*J. A. Cooley* for appellants.

(1) Defendants' demurrer should have been sustained. Neither at the close of the State's case nor at the close of the whole case, was there evidence sufficient to justify submitting the case to the jury, nor to sustain a verdict against either defendant. The verdict is the result of passion and prejudice of the jury, and should be set aside, the judgment reversed and defendants discharged. State v. Francis, 199 Mo. 671. (2) Reversible error was committed in excluding the evidence of Ex-sheriff Williams to the effect that deceased had just before threatened to kill *his wife and himself.* The threat to kill *himself,* had there been no mention of his wife, should have been admitted in view of his act in borrowing the pistol *with which he was killed,* and his conduct and statements at the house as testified to by Mrs. Davis and her children. State v. Fitzgerald, 130 Mo. 432. And in view of the defense offered and the facts testified to by Mrs. Davis and the children, the borrowing of the pistol, going to the house late at night obviously for some unlawful purpose, the testimony of the Danes family as well as the Davises as to what transpired there and the stress laid by the State on Mrs. Davis's failure to give an immediate alarm, the threat of Davis to kill *his wife* as well as himself was clearly admissible and its exclusion reversible error. It tended to characterize and explain his presence and purpose there and show that the fear which actuated her in failing to go out were well founded. State v. Elkins, 63 Mo. 164. (3) The clothes offered by the State were not sufficiently identified, or shown to be in the same condition, *if* defendant's clothes, as when they were in his possession; they were shown not to be the clothes he had on when arrested, and so far as there was any evidence on the

subject it showed they were not worn by him the night of the alleged homicide. There was no sufficient foundation laid for their introduction, nor for the evidence of Dr. Deason as to alleged bloodstains, and Dr. Deason's qualification was not shown.

*John T. Barker,* Attorney-General, and *Lee B. Ewing,* Assistant Attorney-General, for the State.

(1) The evidence justified giving an instruction on murder in the second degree. State v. Andrews, 76 Mo. 101. (2) The court did not err in sustaining objections to proof of alleged statements of deceased, not made at time of the shooting in question, tending to show that deceased contemplated suicide. These alleged statements were not accompanied by any attempt, at the time, to carry them into execution; and, therefore, were hearsay and inadmissible for any purpose. State v. Baurle, 145 Mo. 25; State v. Punshon, 133 Mo. 52; State v. Punshon, 124 Mo. 457; State v. Terry, 172 Mo. 218; State v. Fitzgerald, 130 Mo. 432; State v. Curtis, 70 Mo. 597; 1 Greenleaf on Evidence (14 Ed.), sec. 102; State v. Wilson, 250 Mo. 329. (3) The testimony tending to prove an alleged statement made by deceased, a day or two before the shooting, that he intended to kill his wife was properly excluded. There was no pretense of self-defense in this case. The defendants denied the killing; therefore, this testimony was the baldest hearsay, not binding on the State, and not admissible for any purpose. See cases last cited. (4) The court properly admitted in evidence the pants and shirt proven to have been worn by defendant Ilgenfritz before the killing, and which he afterward had with him in jail. There was blood upon the weatherboarding on the house, where deceased was shot, up as high as the fifth board. There were stains upon the pants that were proven to be human bloodstains. These facts were sufficient to

warrant the introduction of the pants in evidence, and also the testimony of Dr. Deason as to the character of stains upon same. State v. Neal, 178 Mo. 63; State v. Sherouk, 78 Conn. 718; State v. Roszcyniala, 125 Wis. 414; State v. Neufeld, 165 N. Y. 431; People v. Anthony, 146 Cal. 124; State v. Henry, 51 W. Va. 283. (5) · Defendant's demurrer to the evidence was properly overruled. The evidence amply supports the verdict. State v. Baurle, 145 Mo. 1; State v. Concelia, 250 Mo. 411; State v. Rumfelt, 228 Mo. 446; State v. Rasco, 239 Mo. 335; State v. Barrington, 198 Mo. 23. While the evidence is largely circumstantial, it is ample to prove the two things necessary to uphold the verdict, i. e.: First, the *corpus delicti,* the criminal act; and, second, the defendant's guilty agency in the criminal act. (a) To justify a conviction on circumstantial evidence alone, the circumstances should be consistent with each other and with the guilt of the defendant. State v. Maxey, 102 Mo. 374; State v. Hendricks, 172 Mo. 654; 4 Elliott on Evidence, sec. 2709. The circumstances of this case fully meet these requirements; besides, there was direct testimony connecting defendants with the crime. (b) If there is any evidence to support the verdict, then it is the right of the jury to pass upon: First, the weight of the evidence. State v. Baurle, 145 Mo. 1; State v. Shelton, 223 Mo. 141; State v. Devorss, 221 Mo. 477; State v. Sassman, 214 Mo. 477; State v. McDowell, 214 Mo. 343. Second, the credibility of witness. State v. Devorss, 221 Mo. 447; State v. Sassman, 214 Mo. 738; State v. McDowell, 214 Mo. 343; State v. Wolley, 215 Mo. 687; State v. Baurle, 145 Mo. 23. Third, to determine conflict in the evidence. State v. Baurle, 145 Mo. 23; State v. Devorss, 221 Mo. 477; State v. Sharp, 233 Mo. 298.

WILLIAMS, C.—Under an indictment charging them jointly with the murder of Jacob W. Davis, defendants were tried in the circuit court of Adair county

and found guilty of murder in the second degree. The punishment of defendant Ilgenfritz was assessed at fifteen years and that of defendant Lottie Davis at ten years. Defendants duly perfected an appeal to this court. The evidence on the part of the State tended to establish the following facts: The dead body of Jacob W. Davis, who, prior to his death, was the husband of defendant Lottie Davis, was first discovered about 6:30 a. m., on Sunday, October 27, 1912, on the ground, a few feet in the rear of the house in which defendant Lottie Davis and her five daughters then lived in the city of Kirksville, Missouri. The house was a four-room cottage, fronting east, having one front and one rear door. Deceased's body was found lying on its left side in a north-and-south position; the feet near a brick walk at the rear door, and the head toward the south. Underneath the body was a thirty-eight-caliber pistol containing two discharged and three loaded cartridges and between his body and the house was a leather walking stick with a steel rod through the middle. A tub was located between the body and the house. Just north of the brick walk or platform was found a man's light colored hat. The band in the hat contained the initials of the defendant Ilgenfritz. Deceased had been seen wearing this hat a few days prior to the tragedy; one witness saying that he understood that deceased and defendant had traded hats some time prior to the tragedy. A black mark caused by powder burn or smoke was discovered on the under side of the rim of the hat. One strip of weather-boarding on the south side of the house was chipped or split, and there were spots of blood on the weather-boarding, begining on the fifth board from the foundation and extending down to the ground. There was a bullet hole, caused by a thirty-eight-caliber ball, in the head of the deceased. The bullet entered about an inch and a half above the right ear, passed entirely through the brain and skull and lodged un-

der the skin about two inches above and about three-quarters of an inch in front of the left ear. The skin around the left eye was blackened. The revolver found under the body of the deceased was identified as the property of one C. D: Stott, a citizen of Kirks-ville, and shown to have been loaned by said Stott to the deceased on the afternoon preceding the homicide. At the time of the tragedy, deceased and his wife, be-cause of domestic troubles, were living apart; the deceased making his home with a daughter by his first wife. The house in which Mrs. Davis lived, which for convenience will be hereinafter referred to as the Davis home, was located about seventy-five feet west of the Wabash railroad tracks which run north-and-south at this point. One hundred and seventy-five feet south of the Davis home was the home of Mrs. Danes and her three children. The ground between the Davis home and the Danes home was open and unoccupied. The Davis home was in the southwest part of the city and in going to and coming from the main part of town the people of this section frequently used the railroad right of way as a footpath, coming down the railroad tracks to a place in front of the Danes home where there was a gap in the fence and a path led into the road which ran north-and-south in front of the two houses. Defendant Mrs. Davis and defendant Ilgen-fritz appeared to be very intimate and friendly in their association with each other. · Ilgenfritz had been seen by neighbors to go into the Davis home on different occasions and sometimes as often as two or three times a day. One witness testified that he saw defendant go into the Davis home about six o'clock on the evening of the homicide. Ilgenfritz and Mrs. Davis were also seen together at different places of amusement and on some occasions the husband of Mrs. Davis accom-panied them. On one occasion, at night, while the two defendants were sitting on a railroad bridge, near the depot at Kirksville, Ilgenfritz was seen to kiss Mrs.

Davis and put his hand under her clothing. It appeared that the deceased had accompanied them to this place, but, just prior to the occurrence of the above, the deceased had turned away a few steps to go after some pop. The above transaction was noticed by his daughter by his first wife. On another occasion, the defendants and deceased were together fishing at the city reservoir. The two defendants were sitting together under an umbrella, while the husband was a few feet away, out in the rain. At this time the manager of the water company saw Ilgenfritz have his hand under Mrs. Davis's clothing. On the evening of the homicide and between eight and nine o'clock at night, defendant Ilgenfritz and a woman were seen about two miles from the Davis home walking along a country road. Ilgenfritz had his arm around the woman. At one time prior to this, Ilgenfritz was seen walking along a road south of Kirksville at night with a woman. About two or three weeks before the homicide two witnesses heard Ilgenfritz say, referring to the deceased, that "he would get the d—— old s—— of a b——, if he fooled with him." One W. Shorter, who at the time of the trial was serving a term in the penitentiary for larceny, testified, on behalf of the State, that in the day of the tragedy, he had gone to the town of Millard, a few miles south of Kirksville, in search of work; that he left Millard, upon his return, about seven p. m., and walked back to Kirksville along the Wabash railroad right of way; that when he was a short distance south of the Davis home, he heard a pistol shot and stopped for a moment to listen, then continued walking toward the north along the track, and when he had reached a point a short distance south of and opposite the Davis home, he heard another shot, and that immediately thereafter he saw the defendant Ilgenfritz come running from the back of the Davis house toward the railroad track, coming through two fences out onto the right of way of the

railroad at a distance of fifteen or twenty feet in front
of the witness; that it was a moonlight night and he
plainly recognized defendant; that defendant was
bare-headed and was without either coat or vest; that
defendant hastened on down the track in front of the
witness and disappeared at a distance of about three
or four blocks.

Upon the cross-examination of this witness, it was
shown that he and defendant Ilgenfritz had spent a
few days together as inmates of the jail at Macon and
that the witness had an unfriendly feeling toward the
defendant. The witness did not tell any one about
having this information concerning the crime until
two weeks before the trial, at which time, the witness,
then in the penitentiary, desiring, as he says, to lead a
better life, wrote a letter to the prosecuting attorney.
One witness for the State, upon cross-examination,
testified that the reputation of witness Shorter for
truth and veracity was bad. Two witnesses testified
that they saw witness Shorter in Millard on the day
in question.

The State was permitted to introduce in evidence,
over the objection and exception of defendant, some
clothing, more particularly a pair of trousers, claimed
to be the property of defendant Ilgenfritz. There was
some evidence to the effect that Ilgenfritz was seen
wearing this pair of trousers about two days prior to
the tragedy. It also appeared in evidence that some
time after defendants' arrest, Ilgenfritz was taken to
Macon and there confined in jail. There was also evi-
dence introduced that an express package was sent
from Kirksville by Mrs. Ilgenfritz, addressed to de-
fendant at Macon, Missouri, in care of the man who
was jailer at that time. It was not shown what this
package contained. Mr. James Simms testified that
some time in December, 1912, defendant Ilgenfritz,
who had then been returned to jail at Kirksville, said
that he had some clothes at Macon and that a part of

the clothing was "a pair of pants similar to the ones he had on, only he had worn them and got them dirty," and that he would give the witness this pair of trousers if witness would pay the express charge for sending all the clothing. Defendant afterward wrote a letter to the sheriff at Macon and had the bundle of clothes sent by express to witness Simms at Kirksville. Mrs. Simms testified that a short time after this she was at the jail in Kirksville, in the presence of her husband and the defendant Ilgenfritz, and her husband told her to go to the express office and get a package of clothes and that the defendant had given him a pair of "pants." And that Simms told Mrs. Simms, in the presence of defendant, to get a gallon of gasoline and wash the "pants" and press them and bring them to him. On January 1, 1913, the prosecuting attorney, together with the sheriff and another gentleman, called at the home of Mrs. Simms and examined the clothing which Mrs. Simms had received in an express package. At this time the prosecuting attorney wrapped the clothing in a bundle and took them to his office where they were kept for two or three days and then, by him, deposited in a safety vault in the Citizen's National Bank at Kirksville. Several weeks later, Dr. Deason, who testified as an expert for the State, called at the Citizen's National Bank and by pre-arrangement received from that institution the bundle of clothing. Dr. Deason testified that he cut several pieces of cloth from the trousers and made scientific tests of the spots thereon to ascertain whether or not there were any traces of human blood; that he made four different tests of these spots (the first test being made about April 21, 1913), and found that the stains upon the clothing were caused by human blood.

One witness testified that while Ilgenfritz was confined in the jail at Kirksville, he overheard a conversation between Ilgenfritz and his wife in which

Ilgenfritz told her "That she must not be so sore at Mrs. Davis, because if they become enemies it would be bad for him." A number of witnesses for the State also testified that many years before the deceased had received an injury to his right arm, causing the elbow joint to become stiff so that he could not raise his right hand to the back of his head.

The evidence on the part of defendants tended to established the following facts:

About supper time on the day of the tragedy, deceased bought some carbolic acid at a drug store in Kirksville. Mrs. Danes, who lived in the first house south of the Davis home, testified that she and her three children had been up town on the night of the tragedy and were returning home between nine and ten o'clock at night, coming south along the Wabash tracks; that when they were within three or four blocks of the Davis home, Mrs. Davis, coming from the east, came up onto the railroad track and joined them. They walked along together until they reached the path opposite the Danes home and there separated, going to their respective homes. A short time after coming home, one of Mrs. Danes' sons went to the well, at the rear of the Danes home, for a drink. While at the well, he heard some noise and loud talking in the rear of the Davis home; that it was a clear moonlight night and he looked in the direction of the Davis home and saw a man standing on the west side of the Davis home, near the back door thereof, and saw the man turn around and shoot toward a shed. Upon hearing the shot, Mrs. Danes rushed out to the rear of her home and saw the man standing back of the Davis home. Mrs. Danes and her son then returned into their house and in two or three minutes thereafter heard another shot. A short time after the second shot, Mrs. Danes and some of her children looked out the north window of their home toward the Davis

263Mo40

home, but saw no one. They did not know any one had been killed until the next morning when they saw the body of the deceased on the ground near the place where they had seen the man the night before.

Anna Davis, the fourteen-year-old daughter of deceased and defendant Lottie Davis, testified that at the time of the tragedy she and her mother and sisters were inside the Davis home; that her father, the deceased, came to the back door of the home about twenty minutes before ten o'clock p. m.; that her mother answered saying: "Is that you, Jake?" and that he replied, "Yes." Mrs. Davis then said, "What do you want?" To which he answered, "Come to the door and I will show you what I want." Mrs. Davis said, "I told you not to come back any more; you come down to-morrow, I will see you." Thereupon deceased said, "I have got just two shots to fire and one is for me and one is for you." Mrs. Davis then said, "I am going to call the neighbors," and that deceased replied, "You won't have time." Two shots were then fired and the witness heard a sound like an object falling and heard a tub rattle outside. That the inmates of the Davis home were frightened; that none of them went outside to see what happened and no one was notified during the night. This witness admitted that she carried a note from defendant to her mother on the afternoon of the tragedy, and that Ilgenfritz told her that her mother wanted to borrow some money and that the note would tell Mrs. Davis where to meet him. That on the evening of the tragedy her mother left home about 8:30 and returned about nine o'clock. This witness denied that on the day of her father's funeral she told her aunt that "Ilgenfritz killed Papa."

The testimony of Jessie Davis and Stella Davis, daughters of Mrs. Davis and the deceased, and also Mrs. Davis's testimony was substantially the same as the testimony of Anna Davis. Some of them testified expressly that defendant Ilgenfritz was not at the

Davis home and some of them testified that no one was on the inside of the house except Mrs. Davis and her children, and that they heard no one except the deceased on the outside of the house. Some of the members of Mrs. Davis's family testified that after the two shots were fired they were very much frightened and the entire family went into a bedroom where they remained during the night, some of them not sleeping any during the night. One daughter was asked whether she thought her father had killed himself when she heard the pistol shot, and she replied: "I didn't know whether he shot himself or not; he pretended to kill himself so much."

Defendant Ilgenfritz denied that he was at the Davis house on the night of the shooting and denied all knowledge of the facts concerning the shooting. He also denied that the pants which were introduced into evidence belonged to him. He admitted that he and Mrs. Davis were out together on the night of the tragedy and walked along country roads to the south of town, and came back into town and separated at a point about half a mile east of the Davis home, he going to his home and Mrs. Davis going to her home.

Mrs. Ilgenfritz testified that her husband came home about nine o'clock on the night of the tragedy; that when he came in she was in bed and opened the door to let him in without arising from her bed; that upon asking defendant what time it was he replied that it was nine o'clock. She denied the testimony on the part of the State to the effect that her husband while in jail had told her to keep on good terms with Mrs. Davis in order not to injure him.

A number of witnesses testified that deceased had good use of his right arm and that he could raise his right hand as high as his head. Testimony was also introduced to show that the hat found at the place of the tragedy was one that Ilgenfritz had traded to the deceased several weeks before. There was also evi-

dence to the effect that when deceased's body was examined there were powder burns on his hair just above the place where the bullet entered.

The State offered in rebuttal testimony of the aunt of Anna Davis to the effect that the Davis girl had stated to her that "Ilgenfritz killed Papa." There was also testimony denying the presence of powder burns on deceased's hair. It was shown that the distance that Ilgenfritz admitted he walked with Mrs. Davis on the night of the tragedy was about four miles. In rebuttal, the daughter of the deceased by his first wife testified that the carbolic acid purchased by deceased on the night of the tragedy was purchased by him at her request, the same to be used by her for the purpose of killing bedbugs. The reputation of both of the defendants for truth and veracity was shown to be bad. It was also shown that the testimony of the Davis girls at the coroner's inquest contradicted somewhat their testimony on the trial. It was further shown that at the coroner's inquest, defendant Ilgenfritz testified and denied that he was out with Mrs. Davis on the night of the tragedy. Ilgenfritz admitted that he so testified falsely at the coroner's inquest, saying that his reason for so doing was because of the excitement existing and further that since there was nothing immoral between them, he did not want to "throw no reflection" on the family of Mrs. Davis or upon his own family.

I. It is contended that the court erred in admitting in evidence, over the objection and **Evidence: Blood-stained Clothing.** exception of defendant, (1) certain clothing of defendant Ilgenfritz and (2) the testimony of Dr. Deason that upon making a scientific test he found that the spots or stains on said clothing were caused by human blood.

The correct rule concerning the admissibility of such evidence is stated in Wharton on Homicide (3

Ed.), par. 611, page 948, as follows: "To render blood-stained clothing admissible in evidence in such cases, however, its identity must be established, and it must appear that it had not been interfered with, either purposely or otherwise." To the same effect are the following authorities: State v. McAnarney, 70 Kan. 679, l. c. 689; State v. Hossack, 116 Iowa, 194, l. c. 203; State v. Craft, 118 La. 117; State v. Moore, 168 Mo. 432, l. c. 443; 6 Ency. of Evidence, 671. In other words to render such evidence admissible, there should be preliminary proof that the clothing was worn by the accused at the time of the tragedy and that there has been no change in the condition of the clothing between the date of the tragedy and the time of the test of the bloodstains or the time when the clothing is admitted in evidence. It is not essential that this preliminary proof be made by positive or direct evidence, but may be shown, as any other controverted fact, by evidence circumstantial in its nature. [People v. Neufeld, 165 N. Y. 43, l. c. 47.] However the proof should be such that the inference may be fairly drawn that the clothing was worn at the time and that the bloodstains were there received.

While in the present case there was evidence tending to prove that the clothing belonged to defendant Ilgenfritz and was worn by him two days prior to the tragedy, yet, as to the condition of the clothing, whether or not containing bloodstains prior to the time the first test was made on April 21, 1913, six months after the tragedy, the evidence is entirely silent. Neither was there proof concerning the custody of the clothing during the interim between the tragedy and the time it was delivered to Dr. Deason, which would tend to show that the clothing had not been interfered with. The testimony shows that some time in December, 1912, the clothing was received by witness Mrs. Simms at the express office at Kirksville, in an express package claimed to have been forwarded from the jailer at Ma-

con, Missouri, consigned to the husband of the witness. At this time defendant Ilgenfritz was confined in the jail at Kirksville. About January 1, 1913, Mrs. Simms, at her residence, delivered the clothing to the prosecuting attorney in the presence of the sheriff. Thereupon the prosecutor took the clothing to his office where it remained for two or three days and was then placed in a deposit vault at the bank. Later Dr. Deason obtained the clothing from the bank and made the test. None of the witnesses who handled the clothing prior to its delivery for the scientific test undertook in any manner to describe the condition of the clothing. We desire in no manner to cast reflection upon those persons who are shown to have handled the clothing, but the above quoted rule required that either it should have been shown that the clothing contained the spots when delivered for the test and that this condition existed back to the time of the tragedy or back to the time when the clothing was in the custody of defendant under such circumstances as would preclude the probability of prior outside interference therewith, or the preliminary proof should have shown that the custody and care of the clothing between the date of the tragedy and the test was such that no change occurred in the condition thereof. So far as shown by the present record, the clothing may have been accessible to any person from the time of the tragedy until the test was made. It is true that Mrs. Simms testified that just prior to going after the express package, and while at the jail in Kirksville, in the presence of defendant Ilgenfritz, Mr. Simms informed her that defendant had given him a pair of trousers which would be found in the express package and that he (Simms) directed her to wash the same in gasoline and press them and bring them to him. But nothing was said in this conversation concerning blood spots or stains upon the clothing. Gasoline is commonly used in the cleaning of clothing and it does not

appear unusual that Simms directed that gasoline be used in cleaning clothing which he understood had been worn by defendant while in jail. Under such circumstances, little importance can be attributed to the statement or to the defendant's silence when the statement was made. Tested by the rule, above announced, sufficient foundation was not laid for the introduction of the clothing and the testimony concerning the bloodstains, and the same was therefore erroneously admitted.

II. The defendants offered to prove by witness Williams, the sheriff of Adair county at the time of the tragedy, that, either on Friday preceding the killing or on the day of the killing, deceased stated that he intended to kill himself and wife, and that deceased repeated the threat in the presence of the witness two or three times. The State objected to the offer on the ground that the evidence was hearsay and therefore immaterial. The court sustained the objection and excluded the offer and defendants saved an exception. This ruling is assigned as error. There was no evidence of self-defense in the case. Neither was there evidence that this threat to kill Mrs. Davis had been communicated to her. It therefore could not be said, as insisted by appellants, that it became relevant as explaining Mrs. Davis's failure to go outside of her home after the shots were fired, to ascertain just what had occurred. The court therefore did not err in excluding the deceased's threats to kill his wife.

**Suicidal Threats.**

But the point concerning the admissibility of the threats of deceased to commit suicide presents a more serious question and one that leads us into the realm of conflicting authorities.

The cause of deceased's death was the difficult question to be determined by the triers of the facts. The evidence offered pro and con was wholly circum-

stantial.   There was circumstantial evidence tending
to corroborate the theory of the State, at least with
reference to the implication of defendant Ilgenfritz
in the killing.   There was also circumstantial evidence
corroborating the defense's theory of suicide.   It may
be conceded, therefore, that, under such conditions, any
competent evidence tending to corroborate the theory
of suicide would be very material and relevant to the
issues involved.   Was the testimony under the circum-
stances admissible?   Upon careful consideration, we
have reached the conclusion that it was.   At the outset
we are met by the following authorities which hold the
contrary view:   State v. Punshon, 124 Mo. 448, l. c.
457; State v. Fitzgerald, 130 Mo. 407, l. c. 429; State
v. Punshon, 133 Mo. 44, l. c. 52; State v. Bauerle, 145
Mo. 1, l. c. 25; Siebert v. The People, 143 Ill. 571, l. c.
584; Nordgren v. The People, 211 Ill. 425, l. c. 433.

On the other hand, the following authorities hold
that such evidence, under the present circumstances, is
admissible:   Commonwealth v. Trefethen, 157 Mass.
180, l. c. 188; People v. Conklin, 175 N. Y. 333, l. c.
343; State v. Beeson, 155 Iowa, 355, l. c. 362; Shaw
v. People, 3 Hun, 272, l. c. 276; Nordan v. State, 143
Ala. 13, l. c. 26; Blackburn v. State, 23 Ohio St. 146,
l. c. 165-6; Boyd v. State, 14 Lea, 161, l. c. 175; State
v. Kelly, 77 Conn. 266, l. c. 268; 3 Current Law, p. 1654;
5 Columbia Law Review, 157; 1 Wigmore on Evidence,
sec. 143; 3 Bishop's New Criminal Procedure, sec. 631
(5); 1 Wharton's Criminal Evidence (10 Ed.), sec.
237a.

The cases which hold such evidence inadmissible
do so on the theory that the threats of suicide are
hearsay.   The only case in this State which undertakes
to discuss the point at any length is the case of State
v. Fitzgerald, 130 Mo. 407.   An examination of that
opinion, however, will disclose that such evidence *was*
admitted in that case and the entire discussion is based
upon a *supposed* case.   [Id. l. c. 429.]   The decision

of the point was therefore not necessary to a determination of that case and the ruling was *obiter dictum.* This case appears to have been cited by the later cases without further discussion. The conclusion stated in the Fitzgerald case was that threats of suicide in such cases are not admissible unless they were a part of the *res gestae* or dying declarations or *unless* at the time made they were accompanied by an attempt to carry the threat into execution. As to why such threats when accompanied by unsuccessful attempts at execution would *then* lose their hearsay nature and become proper evidence, the authorities taking that view do not give a satisfactory explanation, and it is indeed difficult to discover any logical reason therefor.

It appears that the error in the logic of the opinions holding such threats inadmissible occurs in *assuming* that such threats are merely hearsay. The probability of suicide would be stronger if it could be shown that deceased had a suicidal intent or design. The existence of such an intent or design would therefore become a material fact bearing upon the issues involved. This intent or design is a mental condition and could be evidenced only by deceased's acts or words. All authorities would perhaps agree in saying that any unsuccessful attempt at self-destruction would be admissible as original evidence of the existence of suicidal intent. We see no distinction between such acts and any "verbal acts" which also indicate the same mental state or condition. It might be said that the verbal act was not worthy of belief because it could be made when the declarant had no such intention. As much could also be said concerning an act amounting to an unsuccessful attempt at suicide, for it is not impossible that such acts could be feigned. But since the greater probability is that both are but the direct result of the mental state their exclusion should not be based upon a mere possibility of error. And even though it be conceded, *arguendo,* that the verbal acts were less

trustworthy than the acts amounting to an attempt of suicide, yet, as was well said in the case of Commonwealth v. Trefethen, supra, l. c. 188, "this affects only the weight of the evidence" and not its admissibility.

Suicidal threats are verbal acts, not narrative in character and therefore hearsay, but are the direct result of the action of the mind having the suicidal intent or design, and, in cases like the present, should be admitted as original evidence of the condition of the mind from which they spring. This is the theory of the case of Commonwealth v. Trefethen, supra, the leading case holding such evidence admissible. In that case the testimony excluded was the threat of deceased that she was going to drown herself. The court set aside the verdict on the ground that the exclusion of such evidence was error. In the course of its opinion, the court (italics ours) said:

"Although evidence of the conscious voluntary declarations of a person as indications of his state of mind has in it some of the elements of hearsay, yet it closely resembles evidence of the natural expression of feeling which has always been regarded in the law, not as hearsay, but as original evidence (1 Greenl. Ev., sec. 102); and when the person making the declarations is dead, such evidence is often not only the best, but the only, evidence of what was in his mind at the time.

"On principle, therefore, we think it is clear that, when evidence of the declarations of a person is introduced solely for the purpose of showing what the state of mind or intention of that person was at the time the declarations were made, the declarations *are to be regarded as acts from which the state of mind or intention may be inferred in the same manner as from the appearance of the person or his behavior, or his actions generally.* In the present case the declaration, evidence of which was offered, *contained nothing in the*

*nature of narrative,* and was significant only as show-
ing the state of mind or intention of the deceased.''

The above case has been many times cited with ap-
proval by the courts and text-writers above cited, and
after careful research into the subject we have reached
the conclusion that it states the correct rule regarding
the admissibility of such evidence. It therefore fol-
lows that the above cited Missouri cases, in so far as
they conflict with what is herein decided, should be no
longer followed.

III. It is contended that the evidence is not suf-
ficient to support the verdict. After carefully review-
ing the evidence, we have reached the conclusion that
there is sufficient evidence to justify the
submission of the case to the jury with
reference to defendant Ilgenfritz, but not
sufficient as against defendant Lottie Da-
vis. The intimate relation shown between Ilgenfritz
and deceased's wife furnished evidence of motive.
There was also evidence that Ilgenfritz had threatened
to kill deceased and one witness testified that Ilgen-
fritz ran from the scene of the killing immediately
thereafter. This, unaided by the evidence as to blood-
stains which was improperly admitted upon the pres-
ent trial, was sufficient, when considered with the other
facts shown in evidence, to support the verdict found.
But with reference to defendant Lottie Davis, there
was no evidence of threats nor was there any evidence
of a conspiracy between herself and Ilgenfritz to com-
mit the crime. Her presence near the scene of the
tragedy is not incriminating, because she was at a
place where she had a right to be and where she should
have been at that time of night, to-wit, in her home
with her five children. There was no evidence that
the killing occurred inside the house, but the evidence
as to the bloodstains on the weather-boarding outside,
the pool of blood on the ground under deceased's head

*Margin note:* Sufficient Evidence of Murder.

and the condition in which his body was found tend strongly to show that the killing occurred outside. It was true that the evidence as to motive applied to Mrs. Davis the same as to the other defendant, but evidence of motive alone is not sufficient to make out a prima-facie case of guilt. [State v. Ruckman, 253 Mo. 487, l. c. 499, 500.]

The evidence against Mrs. Davis in the present case was not more incriminating than was the evidence against Mrs. Harris in the case of State v. Larkin and Harris, 250 Mo. 218, l. c. 233, in which case it was held that the evidence was insufficient.

What is here said renders it unnecessary to discuss the instructions which submitted the case to the jury on the theory that Mrs. Davis participated in the killing by being present, aiding and abetting, etc., this for the reason that under the evidence all of the instructions concerning the case as against Mrs. Davis were erroneously given because of the failure of the proof to make a case against her. If additional evidence, connecting Mrs. Davis with the killing, is not produced, she should be acquitted. Other errors are assigned, but since they are such as will not likely occur upon the retrial of the case, it becomes unnecessary to discuss the same here.

The judgments are reversed and the cause remanded. *Roy, C.,* concurs.

PER CURIAM.—The foregoing opinion of WILLIAMS, C., is adopted as the opinion of the court. All the judges concur.